[Crim. No. 745.   Fourth Dist.   Mar. 27, 1951.]

THE PEOPLE, Respondent, v. MANUEL MENDOZA et al., Appellants.

C. W. Dickenson and Wm. J. Clark for Appellants.

Edmund G. Brown, Attorney General, and Frank Richards, Deputy Attorney General, Don C. Bitler, District Attorney, and D. M. McGahey, Deputy District Attorney, for Respondent.

MUSSELL, J.—Defendants were charged in count two of an information with obtaining money by fraudulent game or trick in violation of section 332 of the Penal Code and in count four with conspiracy to obtain money by fraudulent game or trick in violation of said section.

At the second jury trial of the case, defendant Mendoza was found guilty on both counts and defendant Ponce was found guilty on count four and not guilty on count two. After the denial of motions for a new trial, the defendants were sentenced to imprisonment in the state prison and this appeal followed.

The judgments are attacked on the following grounds: (1) Insufficiency of the evidence; (2) the testimony of the complaining witness is inherently incredible; (3) error in the reception of evidence; (4) error in instructions given; and (5) inconsistency of the verdicts.

### Facts

The complaining witness, Manuel Valesquez is a farmer (of Mexican descent) in Imperial county. On August 3, 1949,

the defendants, who are Filipinos, drove out to Valesquez' farm and asked him to gamble with a Chinaman who was "wasting a lot of money on a white girl." They suggested that they had just as well get the money but that they couldn't do it themselves as they were Orientals and the Chinaman wouldn't play with Orientals. On the following day Valesquez went to Calexico and was approached by the defendants, who told him to get in their car; that they were "going to have a game" and "get" the Chinaman. They all drove to the De Anza Hotel in Calexico, where Mendoza registered for a room. They then went up to the room and shortly thereafter Mendoza went out to contact Sam Kee, the assertedly "rich Chinaman" of the case. While Mendoza was away, defendant Ponce stated to Valesquez "This Chinaman has got a lot of money and you can get him for $50,000 or $100,000; that's nothing for him; that's nothing, but don't be afraid. . . . Nothing is going to happen to you. . . . There's nothing, nothing that you could lose." Ponce described to Valesquez a set of signals that he, Ponce, would use to indicate the cards held by the Chinaman in the proposed game of "draw poker." In a few moments Mendoza returned with Kee and gave Valesquez $100 with which to gamble.

Valesquez testified that he bought from Mendoza $100 worth of chips, with the money Mendoza had previously given him and that Kee gave Ponce $150 for the purchase of chips; that Kee and Ponce were seated side by side on a bed directly across a table from Valesquez; that he and Ponce started playing and that Ponce lost not only the original $150 worth of chips, but also an additional $500 in chips which Kee bought from Mendoza on credit for Ponce; that after Ponce lost the $500 worth of chips purchased by Kee on credit, Kee asked Mendoza, who was the banker for the game, for an additional $500 in chips for Ponce. These were furnished and after about one hand, Ponce traded places on the bed with Kee and Kee started playing with Valesquez in place of Ponce; that after a couple of hands, Kee took a check from an envelope and handed it to Mendoza; that Valesquez saw that the check was made out to Kee and was for $10,000; that Mendoza refused the check and told Kee to go out and get the cash; that they were playing a hand at that time and Ponce had been giving the previously arranged signals indicating the cards held by Kee; that after both he and Kee had drawn cards, he, Valesquez, had a "full hand" (three tens and a pair); that at this point Mendoza asked if Kee

could go out and get his check cashed; that Valesquez agreed; that Mendoza and Kee left; that Kee left his cards on the table and during his absence, Ponce showed them to Valesquez, who observed that Kee's hand contained three nines; that after a few minutes, Mendoza and Kee returned, Mendoza carrying a paper bag from which he took some bundles that looked like money bound with $500 bank wrappers; that Kee then ordered chips for all the money above the $1,000 owing by him for chips previously furnished to Ponce; that Kee "tapped" (called) and raised Valesquez $5,000; that Mendoza then told Valesquez "he needed $5,000; that he could get some from the bank; that they needed cash and that a check would not do"; that at Mendoza's request, Kee agreed to let Valesquez go after some money; that Kee gave Mendoza his cards and Valesquez kept his own hand; that Mendoza drove Valesquez to the bank and told him to write a check for $7,000 rather than $5,000; that Valesquez walked out with $7,000 (mostly in small bills) in his hand; that Mendoza then went to a Safeway store, got a paper bag and had Valesquez put the money in it; that they then returned to the hotel room, where Mendoza gave him chips and pennies, used in lieu of chips, for the entire $7,000; that Mendoza then asked if Valesquez was going to bet the $5,000 (to call Kee's bet on the partially played hand); that Valesquez bet on and won that hand; that immediately thereafter Kee asked for and obtained another deck of cards, which he shuffled and dealt and which were not "cut"; that Kee "bid" (bet); that Mendoza "told" Valesquez "all of it" and then asked Valesquez if he would bet; that Valesquez said "yes" and Mendoza put all of Valesquez' pennies and chips in the "pot"; that Mendoza told him to show his cards then, "told him he lost" and that Kee immediately got up, went to the end of the bed where the paper bags were—apparently picked up the money and started to leave; that Mendoza told him to shake hands with Valesquez; that he did so and left immediately; that he could not recall how many chips Kee put in for the last hand; that he, Valesquez, had all the chips at the time the next to the last hand was partially played; that then Kee bought $9,000 in chips in addition to repaying the $1,000 owed for chips previously bought on credit; that Kee had no conversation with Mendoza concerning cashing in the chips at the close of the game.

The testimony of the complaining witness was in many particulars corroborated by the defendants who testified at

the trial. Both stated that they met Valesquez on the day of the game; that Mendoza engaged the hotel room and furnished the cards and chips; that Mendoza left the room to contact Sam Kee, the "rich Chinaman" and returned a few minutes later with him; that a poker game was engaged in with Mendoza as banker was conceded and it was also conceded that by reason thereof, the complaining witness paid out $7,000. The details of the play, as related by Mendoza, who admitted that he and Kee were "gambling associates," differed from those testified to by Valesquez. Mendoza testified that Valesquez and Kee commenced the game and that Ponce did not play; that Kee borrowed the $500 and in about 30 minutes wanted to borrow a like amount; that Valesquez insisted on cash and he, Mendoza, took Kee to a bank in Mexicali; that he let Kee drive his car over the international border; that Kee returned in about 15 minutes carrying a paper bag; that they then returned to the hotel room, where, while Kee was in the bathroom, Valesquez proposed that Mendoza should signal what cards Kee was holding and that they would split the winnings; that Kee ordered and bought $3,500 worth of chips, paying for them in American money from a paper bag; that he took Valesquez to a bank where Valesquez cashed a check for $7,000; that he obtained a paper bag in which Valesquez placed this money and they returned to the hotel; that Valesquez bought $7,000 worth of chips; that Kee and Valesquez played for about an hour during which Mendoza gave the prearranged signals and Valesquez won all of Kee's chips; that he then gave Kee $2,000 in chips against the Mexican money (supposed to be in the paper bag and which was never counted); that he gave Kee the additional chips because "Kee was losing and this was a 'sociable game.'" That the play proceeded until Valesquez was down to about $600, which he lost on the last hand.

Ponce, who was in the hotel room during the entire time of the card game, which he stated continued from 11 a.m. to approximately 3 o'clock in the afternoon, testified that he was reading the sports news in the Los Angeles Times; that he did not engage in the game; that all he was doing there was "waiting for Manuel until they got through."

Mendoza and Ponce were arrested a few days after the game. At the time, Mendoza was driving and Ponce was riding in a Buick automobile, in the glove compartment of which, in an envelope with some personal papers belonging

to Mendoza, was what purported to be a cashier's check drawn on the First National Bank of San Francisco, dated May 10, 1949, payable to the order of Sam Kee, in the sum of $10,000. This check bears no endorsement and it was stipulated by counsel for defendant that there has been no such bank during at least the last 15 years. Mendoza testified that he had not seen the check from the time Kee allegedly left him to go to the bank in Mexicali until it was shown to him at the sheriff's office following his arrest.

Mendoza, when first questioned by the officers, denied having received any money from the game. Later he stated that his "cut" out of it was $900. At the trial he testified that Kee game him $200 as a "tip" for his services.

Defendant Ponce, when first questioned by the officers, stated that he had not been involved in the game. He later admitted that he had been present but stated that he did not play. He also admitted that he had been previously convicted of a felony (grand theft).

Evidence was introduced by the prosecution of a similar alleged poker game previously engaged in by defendant Ponce. That evidence was admitted as against Ponce only and for a limited purpose. It consisted of the testimony of one Basilio Gacer who stated that in 1943, Ponce persuaded him to participate in a purported poker game to win money by means of prearranged signals from a supposedly rich Chinaman; that Ponce gave him money with which to start the play; that he, Gacer, started playing against Ponce with the money given him and Ponce played with money furnished by Wong (the Chinaman); that Gacer won at first and Wong took Ponce's place; that Ponce gave signals indicating the cards held by Wong; that Wong at first let Gacer win approximately $1,000, then when Gacer had all his money in the pot, acting upon Ponce's signal, Wong raised him $1,000 in the middle of a hand; that Ponce persuaded Gacer to go to the bank and draw out $580; that Ponce took both Wong's cards and Gacer's with him when he took Gacer to the bank; that Ponce showed Gacer the cards and Gacer's was the better hand; that Gacer won that hand and wanted to quit but Ponce persuaded him to play one more hand; that Ponce signaled him to bet everything he had; that he did and that Wong won and the game was concluded.

Defendants first argue that the evidence is insufficient to support the judgment. The statute applicable and upon

which the prosecution is based (Pen. Code, § 332) is quite broad in its terms. It provides in part:

"Every person who by the game of "three-card monte," so-called, or any other game, device . . . , trick or other means whatever, by the use of cards . . . or while betting on sides or hands of any such play or game, fraudulently obtains from another person money or property of any description, shall be punished as in case of larceny of property of like value."

Viewing the entire record, it is apparent that the defendants conspired to obtain money from the complaining witness by fraudulent game, device or other means within the meaning of the statute. There is substantial evidence that the complaining witness was the victim of a "bunco game" conducted by the defendants; that he was induced to believe that money could be obtained from a supposedly "rich Chinaman" by means of a card game; that the defendants induced Valesquez to participate in such a game ostensibly for that purpose, when in fact the real purpose and scheme was to fraudulently obtain Valesquez' money; that this was accomplished with the aid of Kee, who agreed to divide the spoils with them. Valesquez was permitted to win steadily until the last hand of the game, when his money was quickly taken from him. The purported cashier's check for $10,000, exhibited and used by Kee, was never cashed and was found in the car in which the defendants were riding at the time of their arrest. Mendoza admitted to the officers that he contacted Kee after the game and obtained a $900 "cut" from him and at the trial testified that Kee gave him $200 as a "tip" because Mendoza made arrangements for the game and was banker. The purported game of draw poker was not an essential part of the scheme. It was merely part of the stage setting and afforded an opportunity to build up Valesquez' confidence. Ponce testified in this connection as follows: "Allright, the Chinaman come. Well, I know we are there to play cards. Of course, I don't know what kind of game we are going to play, see."

Defendants next argue that the testimony of Valesquez is so inherently incredible as to be unworthy of belief. The rules governing the power of an appellate court to review a judgment by reason of the inherent incredibility of the prosecution's evidence are as set forth in *People* v. *Moreno*, 26 Cal.App.2d 334, 336 [79 P.2d 390], as follows:

"Unless the appellate court can say that the testimony is so obviously and inherently improbable as to leave the court no recourse without self-stultification, except to reverse the

judgment, the reviewing court should not interfere with the verdict and the judgment of the trial court upon that ground. (*People* v. *Antunez,* 28 Cal.App. 740 [153 P. 963] ; *People* v. *Becker,* 140 Cal.App. 162 [35 P.2d 196].) Such improbability must 'plainly appear before the reviewing court should assume the functions of the trial jury'. (*People* v. *Antunez, supra.*) 'Contradictions and inconsistencies in the testimony of a witness alone will not constitute inherent improbability' (*People* v. *Amadio,* 25 Cal.App. 729 [145 P. 151], and 'it is not sufficient that the testimony may disclose circumstances which are unusual.' (*People* v. *Collier,* 111 Cal.App. 215, 226 [295 P. 898].)''

And in *People* v. *Phillips,* 76 Cal.App.2d 515, 520 [173 P.2d 392], in the following language:

''The credibility of a witness and the weight to be given to his testimony are, of course, issues solely for the jury or trier of facts. (*People* v. *Marble,* 8 Cal.2d 139, 141 [64 P.2d 135] ; *People* v. *Voice,* 68 Cal.App.2d 610, 614 [157 P.2d 436] ; *People* v. *Santora,* 51 Cal.App.2d 707, 711 and 712 [125 P.2d 606].) It is only where the testimony relied upon by the prosecution is so inherently improbable as to amount to no evidence at all that an appellate court is authorized to reverse a judgment (*People* v. *Stephens,* 66 Cal.App.2d 755, 757 [152 P.2d 1019] ; *People* v. *Moreno,* 26 Cal.App.2d 334, 336 [79 P.2d 390]), and contradictions or inconsistencies in the testimony of a witness do not render it inherently improbable within this rule. *People* v. *Carlisle,* 66 Cal.App.2d 874, 876 [153 P.2d 401] ; *People* v. *Moreno, supra.*''

In the instant case the credibility to be given to the testimony of Valesquez was a matter for the determination of the jury. It was supported in many respects by the testimony of the defendants themselves and by other testimony in the record. While the record discloses circumstances which are unusual, we are not able to say as a matter of law that the testimony of the complaining witness, under the circumstances disclosed, was inherently incredible.

It is next contended that the court erred in receiving the testimony of the witness, Basilio Gacer, over the objections of the defendants. This evidence was admitted for a limited purpose and before the witness testified, the court very carefully and emphatically instructed the jury that the anticipated testimony was being admitted in a very limited way only; that it was not to be considered in connection with defendant Mendoza; that it might be considered by the jury only as to

defendant Ponce, stating, "It may be considered by you as to whether or not it shows knowledge as a part of criminal intent in absence of good faith on the part of Ponce in connection with the offense with which he is charged and with which he is on trial at this time and for that purpose only." At the close of the trial, before the case was sent to the jury, the judge again cautioned and instructed the jury in similar language. This court had occasion to consider the question of the admissibility of evidence of similar offense in *People* v. *Darnell,* 97 Cal.App.2d 630 [218 P.2d 172], and there held, at page 634, that evidence of other acts of a similar nature may be admitted, when not too remote, to prove a material fact or where they tend to show motive, scheme, plan or system (Citing *People* v. *Henderson,* 79 Cal.App.2d 94, 119 [179 P.2d 406]) and that such similar acts may be either before or after the perpetration of the crime charged. (Citing *People* v. *Weir,* 30 Cal.App. 766, 767 [159 P. 442] ; *People* v. *Talbot,* 220 Cal. 3, 17, 18 [28 P.2d 1057].)

As was said in *People* v. *Peete,* 28 Cal.2d 306, 315 [169 P.2d 924] :

" 'The general tests of the admissibility of evidence in a criminal case are : . . . does it tend logically, naturally, and by reasonable inference, to establish any fact material for the people, or to overcome any material matter sought to be proved by the defense? If it does, then it is admissible, whether it embraces the commission of another crime or does not, whether the other crime be similar in kind or not, whether it be part of a single design or not.' " (Citing many cases.)

The evidence produced by Gacer definitely tended to prove Ponce's guilty knowledge as to the nature of the transaction taking place and his criminal intent in participating therein. Ponce's defense was that he was present with innocent intentions; that he had no knowledge of any conspiracy between Kee, Mendoza and himself and that all the acts done were completely innocent of any fraudulent intentions toward Valesquez. Ponce did not deny that he had been present when the game was played nor that he was with Mendoza when they visited Valesquez at his ranch the day before the game and did not deny that a game of purported draw poker was played nor that Mendoza, he and Kee were all present at the time, and there was no denial by him or Mendoza that Valesquez lost his $7,000.

We find no error in the court's ruling admitting the testimony of Gacer under the circumstances.

■ It is next claimed that the court erred in giving certain instructions. These instructions related to the purpose for which the testimony of Gacer was admitted, and in view of what we have said relating to the admissibility of the testimony, we see no error in the criticized instructions in that respect.

■ Finally, it is contended that the verdicts are inconsistent and repugnant to each other. This contention is without merit. The argument is that the jury in finding Ponce not guilty of violation of section 332 of the Penal Code was, in effect, a finding that an overt act had been done pursuant to the conspiracy but that the substantive crime had not been committed as a result thereof. However, the jury may have concluded that while Ponce engaged in the conspiracy and committed the overt acts thereof he did not actually obtain a "cut" from the Chinaman and that Mendoza did in fact obtain $900 from Kee. Under these circumstances, we find no inconsistencies in the verdicts.

Judgments and orders affirmed.

Barnard, P. J., and Griffin, J., concurred.

A petition for a rehearing was denied April 6, 1951, and appellants' petition for a hearing by the Supreme Court was denied April 26, 1951.