[No. B068650. Second Dist., Div. Five. Sept. 16, 1993.]

THE PEOPLE, Plaintiff and Respondent, v.
DONALD LERNARD PROCTOR, Defendant and Appellant.

**[Opinion certified for partial publication.*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part II of the Discussion.

**COUNSEL**

Ann Jory, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Janelle B. Davis and William M. Wood, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**GRIGNON, J.**—Defendant and appellant Donald Lernard Proctor appeals from a judgment after a jury trial in which he was convicted of conspiracy to defraud another of property by theft (Pen. Code, § 182, subd. (a)(4)), a felony. He contends the confidence scheme for which he was convicted, the so-called "Jamaican Switch," should have been charged under the special statute criminalizing confidence games, Penal Code section 332, a misdemeanor under the facts of this case, rather than the more general felony conspiracy statute. He also contends the trial court coerced him into abandoning his in propria persona status. In the published portion of this opinion, we conclude the confidence scheme engaged in by defendant is not a fraudulent game proscribed by Penal Code section 332. In the unpublished portion of this opinion, we conclude defendant voluntarily agreed to the revocation of his in propria persona status. Accordingly, we affirm.

### PROCEDURAL BACKGROUND

Defendant was charged by information with conspiracy to defraud another of property by theft in violation of Penal Code section 182, subdivision (a)(4) and attempted grand theft in violation of Penal Code sections 664 and 487, subdivision 1. It was further alleged that defendant had suffered a prior felony conviction for which he had served a prior prison term within the meaning of Penal Code section 667.5, subdivision (b). It was further alleged that defendant was out on bail when he committed the offense in question within the meaning of Penal Code section 12022.1. The information was subsequently amended to allege attempted petty theft in violation of Penal Code section 484, subdivision (a) in place of attempted grand theft. The attempted petty theft charge was later dismissed. Defendant was originally charged with two codefendants, Reginald and Robert Johnson; both codefendants entered guilty pleas to the conspiracy charge and were sentenced to state prison.[1]

---

[1]We have taken judicial notice of the superior court file in this case, No. VA008271.

Defendant was convicted by the jury as charged. The trial court found the prior felony conviction and out-on-bail allegations to be true. Defendant was sentenced to six years in state prison on June 10, 1992.[2]

FACTS

On June 25, 1991, 70-year-old Robert Henderson was approached by defendant at a gas station in the City of Bell. Defendant, speaking with a British accent, asked Henderson to give him a ride to the nearest Catholic church. Henderson agreed to take defendant to a nearby Catholic mission.

When they arrived at the mission, defendant told Henderson his name was Mudada Mpho, he was from Africa, and he had come to the United States to receive a $150,000 insurance settlement for the death of his brother in a plane crash. He showed Henderson a letter from an attorney verifying defendant's entitlement to $150,000 and a letter from a Lutheran church advising Africans that valuables brought back to Africa would be confiscated by the government. Defendant also showed Henderson two rolls of money with $100 bills on the outside.

Defendant then beckoned to Reginald Johnson, who just "happened" to be walking by, and asked him to be a witness. Defendant repeated his story to Reginald Johnson. Defendant told Henderson and Reginald Johnson he had to leave the United States that night or he would be in violation of his visa. Defendant then offered to give Henderson and Reginald Johnson each $50,000 to $60,000. They could each keep $10,000 to $20,000 for their respective families, and the remainder should go to charity.

In order to assure himself that Henderson and Reginald Johnson were reliable members of the community, defendant suggested each man withdraw several hundred dollars from his bank account. Reginald Johnson said he had $35,000 in a bank in Huntington Park and agreed to go to the bank to withdraw some funds. Henderson realized he was involved in a confidence scheme, but played along with the two men in hopes of seeing them arrested. He said he had $6,000 to $7,000 in a safe deposit box.

Henderson drove the two men to Reginald Johnson's bank. Reginald Johnson went into the bank and returned with a bank envelope bearing the words, "$15,000 cash" and containing some cash inside. Reginald Johnson

---

[2]Defendant pled guilty to a charge of grand theft in case No. BA012140 on April 13, 1992, the case underlying the out-on-bail allegation in this case. On July 23, 1992, he was given a concurrent state prison sentence. He appealed the judgment in No. BA012140, but later dismissed the appeal (B069516). We have taken judicial notice of the superior court file in case No. BA012140 and our file in case No. B069516.

gave the envelope to defendant. Defendant placed the envelope and one of his rolls of cash in a prayer cloth. He wrapped up the prayer cloth, had the three men place their hands on it and pray, and then gave the bundle to Reginald Johnson. Reginald Johnson took the bundle into the bank. When he returned, he indicated the roll of cash had contained $500 bills.

Henderson said he had to go home to get the key to his safe deposit box. He suggested the two men wait for him on the corner. Henderson dropped the two men off on the corner, went to his home, and called the police. The police arrested defendant and Reginald Johnson in a car driven by Robert Johnson. Both Reginald Johnson and defendant were in possession of rolls of phony money with real bills on the outside. Defendant did not have an accent.

A bunco expert with the Los Angeles Police Department described the confidence scheme engaged in by defendant and the Johnsons as a "Jamaican Switch." Specifically, he described the scheme as the donation version of the Jamaican Switch. A typical donation Jamaican Switch works in the following manner. It normally involves three persons. The first individual is the "catch" person. This person approaches the intended victim and persuades the victim that the catch individual is a very naive and unsophisticated foreigner. The catch individual further persuades the intended victim that the catch individual has a great deal of money which cannot be taken back to his or her own country, he or she is trying to give the money to charity, and he or she must return to his or her own country immediately. The catch person shows a phony roll of money to the intended victim and some documents to support the story. The catch person persuades the intended victim to assist the catch person in finding the charity location.

At this point, the "cap" person will arrive on the scene. The catch person will appear to inveigle the cap person into assisting and will explain the whole story again. It will appear to the intended victim that the catch and the cap individuals are unrelated. Ultimately, it will be suggested that the catch individual give the money to the cap individual and the victim. The cap individual and the victim will donate most of the money to charity, but will keep some amount for themselves. Then the catch person will state that he or she needs some assurance that the cap person and the victim will in fact give the money to charity. It will be suggested that the cap person and the victim establish their reliability by withdrawing some money from a bank account.

The three individuals will go first to the bank of the cap person who will appear to withdraw money from the bank. The cap person will show the phony money to the catch person, who will then give the cap person a roll of

phony money to put into his bank account. This exchange of money usually involves placing the cap person's money together with the catch person's money.

Next, the same scenario will be played out with the victim. However, when the victim returns from the bank with money, the catch person will keep the victim's money in the exchange. The victim will return to the bank to return the withdrawn money and deposit the money received from the catch person. When the victim goes into the bank the second time, a third individual, the lookout and getaway driver, will arrive to take away the catch person, the cap person, and the victim's money.

## DISCUSSION

### I. *Special Statute*

■ Defendant contends he should only have been prosecuted under the special statute criminalizing fraudulent games (Pen. Code, § 332) and not the more general conspiracy statute (Pen. Code, § 182, subd. (a)(4)). Defendant argues that a Jamaican Switch is included within the proscribed conduct set forth in Penal Code section 332. Respondent counters that Penal Code section 332 proscribes fraudulent "games" and a Jamaican Switch is a scheme not a game.

■ "It is a firmly established principle where specific conduct is prohibited by a special statute, a defendant cannot be prosecuted under a general statute." (*People* v. *Mayers* (1980) 110 Cal.App.3d 809, 813 [168 Cal.Rptr. 252].) "It is the general rule that where the general statute standing alone would include the same matter as the special act, and thus conflict with it, the special act will be considered as an exception to the general statute whether it was passed before or after such general enactment . . . ." (*Id.* at p. 814, internal quotations omitted.) The fundamental requirement for the application of the rule is a specific statute proscribing the defendant's conduct with a lesser penalty than the general statute. (*Mitchell* v. *Superior Court* (1989) 49 Cal.3d 1230, 1250 [265 Cal.Rptr. 144, 783 P.2d 731].)

Penal Code section 182, subdivision (a)(4) provides as follows: "(a) If two or more persons conspire: [¶] (4) To cheat and defraud any person of any property, by any means which are in themselves criminal, or to obtain money or property by false pretenses or by false promises with fraudulent intent not to perform such promises. [¶] They are punishable as follows: [¶] When they conspire to do an act described in paragraph (4), they shall be punishable by imprisonment in the state prison, or by imprisonment in the

county jail for not more than one year, or by a fine not exceeding ten thousand dollars ($10,000) or both."

Penal Code section 332 provides as follows: "(a) Every person who by the game of 'three card monte,' so-called, or any other game, device, sleight of hand, pretensions to fortune telling, trick, or other means whatever, by use of cards or other implements or instruments, or while betting on sides or hands of any play or game, fraudulently obtains from another person money or property of any description, shall be punished as in case of larceny of property of like value. [¶] (b) For the purposes of this section, 'fraudulently obtains' includes, but is not limited to, cheating, including, for example, gaining an unfair advantage for any player in any game through a technique or device not sanctioned by the rules of the game. [¶] (c) For the purposes of establishing the value of property under this section, poker chips, tokens, or markers have the monetary value assigned to them by the players in any game."[3]

■ Since the amount defendant attempted to obtain from the victim in this case appears to have been less than $400,[4] a violation of Penal Code section 332 would have been a misdemeanor, while the general conspiracy statute of which defendant was convicted is a "wobbler," chargeable as either a misdemeanor or a felony.[5] Thus, if a Jamaican Switch is conduct proscribed by Penal Code section 332, it would then be necessary to determine whether Penal Code section 332 is a special misdemeanor statute precluding prosecution under the general felony conspiracy statute. We must first, therefore, determine whether a Jamaican Switch constitutes conduct proscribed by Penal Code section 332.

Penal Code section 332 is contained in title 9, chapter 10 entitled, "Gaming." "Gaming" is defined in Penal Code section 330 as "any game of faro, monte, roulette, lansquenet, rouge et noire, rondo, tan, fan-tan, seven-and-a-half, twenty-one, hokey-pokey, or any banking or percentage game played with cards, dice, or any device . . . ." Penal Code section 332 is entitled, "Winning by fraudulent means, trick, or cheating." "A careful reading of [Penal Code section] 332 reveals a specific legislative sanction of fraudulently conducted games of which three-card monte is but one." (*People* v. *Mayers, supra*, 110 Cal.App.3d at p. 815.) Penal Code section 332 is "directed at fraudulent games." (2 Witkin & Epstein, Cal. Criminal Law (2d

---

[3] Subdivision (c) was added to Penal Code section 332 in 1991, effective January 1, 1992. (Stats. 1991, ch. 684, § 3.)

[4] Defendant only suggested that Reginald Johnson and Henderson each withdraw several hundred dollars from his bank account.

[5] Of course, since defendant did not obtain any money or property from the victim, he could only have been convicted of an attempted violation of Penal Code section 332.

ed. 1988) Crimes Against Public Peace and Welfare, § 857, pp. 981-982.) Penal Code section 332 prohibits fraudulent fortune telling along with other fraudulent gaming devices. (*In re Bartha* (1976) 63 Cal.App.3d 584, 591 [134 Cal.Rptr. 39, 91 A.L.R.3d 759], disapproved on other grounds in *Spiritual Psychic Science Church* v. *City of Azusa* (1985) 39 Cal.3d 501, 508-509 [217 Cal.Rptr. 225, 703 P.2d 1119].)

The published authority concerning convictions of Penal Code section 332 invariably relates to fraudulent games. (*People* v. *Shaughnessy* (1895) 110 Cal. 598 [43 P. 2] [lottery, drawing for prizes]; *People* v. *Frigerio* (1895) 107 Cal. 151 [40 P. 107] [card game]; *People* v. *Rose* (1890) 85 Cal. 378 [24 P. 817] [game of bunco, lottery]; *People* v. *Mayer, supra*, 110 Cal.App.3d 809 [three-card monte]; *People* v. *Mendoza* (1951) 103 Cal.App.2d 113 [229 P.2d 83] [draw-poker].) Defendant has cited and we have discovered no authority for the proposition that Penal Code section 332 is applicable to confidence schemes other than fraudulent games.

When the statute was amended in 1991, to add Penal Code section 332, subdivision (c) relating to the establishment of the value of property, the amendment was enacted as part of legislation concerning cheating at cards. The Legislature found that the card-club industry is important to the economic well-being of the state, card cheating is a threat to the integrity and financial health of card clubs, and card cheats should be vigorously prosecuted. (Stats. 1991, ch. 684, § 1, subd. (a)(1), (2).) The Legislature expressly stated: "It is the intent of the Legislature in adopting this act to facilitate the prosecution of those who violate Section 332 of the Penal Code; to foster recognition that violations occur through the counterfeiting, misappropriation, and other misuse of poker chips, tokens, and markers; and to encourage local prosecutors to develop policies for the prosecution of these cases." (Stats. 1991, ch. 684, § 1, subd. (b).)

From the foregoing, it is clear that the statute prohibits winning at games by cheating. Such a conclusion is consistent with the language of the statute. The statute expressly prohibits cheating to obtain money or property of a victim by game, device, sleight of hand or trick "by use of cards or other implements or instruments." (Pen. Code, § 332, subd. (a).)

Defendant argues that Penal Code section 332 has a broader reach than card games and is applicable to other bunco or confidence games. We agree. Defendant argues further, however, that a Jamaican Switch is such a bunco or confidence game. We disagree. A Jamaican Switch is not a game of any kind. It is a scheme to defraud a victim of money or property. The reach of Penal Code section 332 is not so broad. Were we to accept defendant's

interpretation, Penal Code section 332 would include all fraudulent schemes. Such was clearly not the intent of the Legislature.

Nor are we persuaded that the employment in the scheme of the fraudulent letters from the attorney and the Lutheran Church, the phony roll of money, and the prayer cloth brings this confidence scheme within the confines of Penal Code section 332. Many confidence schemes unrelated to games may employ phony documents or other written instruments. The employment of such props is not sufficient to bring a scheme to defraud within the purview of a fraudulent gaming statute. As we have already noted, such a broad interpretation would bring virtually every scheme to defraud within the confines of Penal Code section 332. We have concluded that this is not the intent of the Legislature.[6]

II. *In Propria Persona Status**

. . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is affirmed.

Turner, P. J., and Armstrong, J., concurred.

---

[6]Since we have concluded that a Jamaican Switch is not conduct proscribed by Penal Code section 332, we need not address whether Penal Code section 332 is a special statute precluding prosecution under Penal Code section 182, subdivision (a)(4). (Compare *People* v. *Mayers*, *supra*, 110 Cal.App.3d 809 with *People* v. *Jones* (1964) 228 Cal.App.2d 74 [39 Cal.Rptr. 302].)

*See footnote, *ante*, page 1055.