[Crim. No. 24790. Dec. 28, 1989]

JAMES LLOYD MITCHELL et al., Petitioners, v.
THE SUPERIOR COURT OF THE CITY AND COUNTY OF
SAN FRANCISCO, Respondent;
THE PEOPLE, Real Party in Interest.

1234

**COUNSEL**

Joseph Caliore, Dennis Roberts, Robert L. Thorp, Michael Kennedy, Thomas Steel and Emily Graham for Petitioners.

Ephraim Margolin and Amitai Schwartz as Amici Curiae on behalf of Petitioners.

No appearance for Respondent.

John K. Van de Kamp, Attorney General, Daniel J. Kremer and Steve White, Chief Assistant Attorneys General, William D. Stein and John H. Sugiyama, Assistant Attorneys General, Clifford K. Thompson, Dane R. Gillette, Aileen Bunney and Christopher J. Wei, Deputy Attorneys General, Arlo Smith, District Attorney, and Bernard Walter, Deputy District Attorney, for Real Party in Interest.

## Opinion

**EAGLESON, J.**—The Red Light Abatement Law (hereafter RLAL) (Pen. Code, § 11225 et seq.)[1] provides for injunctions to abate nuisances on premises where prostitution and lewdness occur. The trial court found petitioners in violation of an injunction issued under the RLAL. Section 11229 makes violation of such an injunction a contempt of court, and authorizes a maximum sentence of six months' imprisonment and a $1,000 fine for each such violation.

Petitioners seek review of the judgment of contempt entered pursuant to section 11229, which imposed on them substantial fines and six-month jail terms. The principal question presented by their petition for writ of certiorari is whether persons charged with contempt under section 11229 are entitled to a jury trial under the California or United States Constitutions. Petitioners further assert that the acts underlying the contempt charges were neither lewd nor acts of prostitution, and that the numerous acts detailed by the trial court, which occurred over a period of four days, may not each be punished as individual contempts, but constitute at most one contempt violation per day.[2]

We shall conclude that because a defendant in a contempt proceeding under section 11229 faces a potential sentence of six months' imprisonment and a $1,000 fine per violation—a sentence equivalent to that of many misdemeanors—the California Constitution guarantees the defendant the right to trial by jury in such a proceeding. Accordingly, the judgments against petitioners must be annulled.

For purposes of retrial we further hold that insofar as an injunction authorized under the RLAL is an injunction to abate a nuisance, namely, the maintaining of premises where prostitution and lewdness occur, persons who violate such an injunction may properly be charged under section 11229 with only one count of contempt for each separate day they permit the prohibited nuisance to continue.

We shall also conclude that no statutory obstacles preclude the People from exercising discretion to proceed against a person who has violated a

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

[2] We do not consider petitioners' claim that the injunction was itself invalid as an improper restraint on conduct protected by the First Amendment. That claim, and the related assertion that if the RLAL applies to live theatrical performances it is to that extent unconstitutional, were made by petitioners James Mitchell and Artie Mitchell in the appeal from the order granting the injunction, an appeal which they subsequently abandoned. We deem that abandonment a waiver of the claim. (Cf. *In re Dixon* (1953) 41 Cal.2d 756, 759 [264 P.2d 513].)

RLAL injunction under the less-serious general contempt provisions of Code of Civil Procedure section 1209 et seq. As will be shown, it has long been settled that the Code of Civil Procedure summary contempt statute triggers neither a state constitutional nor statutory right to a jury trial. However, because the penalties for attempts charged under the RLAL are substantially greater than those attaching to Code of Civil Procedure section 1209 contempts—thereby giving rise to a right to jury trial in the former but not the latter proceedings—due process requires that the prosecution afford the defendant fair notice of the nature of the penalties and proceedings he will face by indicating, in the declarations filed to initiate the contempt proceeding, the jurisdictional basis for the action.

## I. *Facts*

Petitioners James Mitchell and Artie Mitchell were the proprietors of a San Francisco business offering filmed and live "adult" entertainment. Petitioner Vincent Stanich was the manager of the establishment.

In 1980, the San Francisco District Attorney filed a public nuisance action against petitioners' establishment under the RLAL.[3] An injunction issued in that action in January 1981[4] directed to James Mitchell, Artie Mitchell, other named individuals and entities, and their agents, servants, employees and representatives. It enjoined the parties from "[a]llowing the occurrence, continuance or reoccurrence of acts of lewdness or prostitution upon the premises" of the Mitchells' theater.

In 1982, contempt proceedings were initiated pursuant to declarations by five police inspectors and an assistant district attorney charging petitioners

---

[3] The underlying action was authorized by sections 11225 and 11226. Section 11225 provides in part: "Every building or place used for the purpose of illegal gambling as defined by state law or local ordinance, lewdness, assignation, or prostitution, and every building or place in or upon which acts of illegal gambling as defined by state law or local ordinance, lewdness, assignation, or prostitution, are held or occur, is a nuisance which shall be enjoined, abated and prevented, and for which damages may be recovered, whether it is a public or private nuisance."

Section 11226 provides in part: "Whenever there is reason to believe that a nuisance as defined in this article is kept, maintained or is in existence in any county, the district attorney, in the name of the people of the State of California, shall, or the city attorney of an incorporated city, or any citizen of the state resident within the county, in his or her own name may, maintain an action in equity to abate and prevent the nuisance and to perpetually enjoin the person conducting or maintaining it, and the owner, lessee or agent of the building, or place, in or upon which the nuisance exists, from directly or indirectly maintaining or permitting it."

[4] Section 11227 provides: "Whenever the existence of a nuisance is shown in an action brought under this article to the satisfaction of the court or judge thereof, either by verified complaint or affidavit, the court or judge shall allow a temporary writ of injunction to abate and prevent the continuance or recurrence of such nuisance."

with violation of the injunction issued in the abatement action. In April 1982 the trial court issued an order to show cause to James Mitchell, Artie Mitchell and others.

Petitioner Vincent Stanich was not named in the order to show cause, but one "Alex Denton" was. Both the order granting the preliminary injunction and the order to show cause were served on Stanich, who appeared in the contempt proceeding. He asserted that no "Alex Denton" existed, and that although the prosecution may have intended to name Denton as manager of the Mitchells' business and served him in the belief he was Denton's successor, he (Stanich) was not a named defendant, and no person designated as a "manager" had been named as a defendant. On that basis Stanich claimed the trial court lacked jurisdiction over him in the contempt proceeding.

After a seven-day evidentiary hearing, the court found petitioners in contempt of the preliminary injunction. The contempt judgment describes the general nature of the conduct which the court concluded violated the injunction: "The conduct complained of can be put into two categories: *off-stage* conduct, where performers permitted (if not encouraged) patrons to fondle genitals, breasts and buttocks, to engage in digital intercourse and oral copulation in return for tips; and secondly, *on-stage* conduct, where performers masturbated, inserted dildos in their vaginas, and engaged in oral copulation with other performers." The court found that defendants had knowledge of the injunction and the ability to comply with it, but had instituted only cosmetic changes in the operation of the business in response to the injunction. The court concluded that the conduct was lewd conduct within the meaning of subdivisions (a) and (b) of section 647,[5] and as such violated the injunction.

The court also expressly concluded that the onstage conduct was not a theatrical performance. It adopted the reasoning of *People* ex rel. *Hicks* v. *Sarong Gals* (1972) 27 Cal.App.3d 46 [103 Cal.Rptr. 414], that an exhibition calculated to arouse sexual desires and release inhibitions rather than to express emotion and dramatic feeling was simply commercialized lewdness. Therefore, the court held, the conduct was lewd as that term is utilized in section 647, subdivision (a), and was not "expression" protected by the First Amendment. (Cf. *Barrows* v. *Municipal Court* (1970) 1 Cal.3d 821 [83 Cal.Rptr. 819, 464 P.2d 483].) The court also found, however, that

---

[5] Section 647 reads in pertinent part: "Every person who commits any of the following acts is guilty of disorderly conduct, a misdemeanor: [¶] (a) Who solicits anyone to engage in or who engages in lewd or dissolute conduct in any public place or in any place open to the public or exposed to public view. [¶] (b) Who solicits or who agrees to engage in or who engages in any act of prostitution. . . . As used in this subdivision, 'prostitution' includes any lewd act between persons for money or other consideration."

the conduct was obscene and thus, even were it to be considered a theatrical performance, it was not protected. (*Id.* at pp. 830-831.) Finally, the court determined that the lewd conduct was done for compensation inasmuch as the theater patrons paid admission and, notwithstanding "no-tipping" signs, overtly offered tips to the performers in return for sexual favors. Thus, the court concluded the lewd acts were also acts of prostitution proscribed by section 647, subdivision (b).

The judgment recited in detail the evidence on which the court based its finding of multiple lewd acts. Each lewd act between a performer and a patron was considered a separate contempt. The individual contemptuous acts identified by the court totalled 61, but the judgment mistakenly recited the total as 62. Petitioners James Mitchell and Artie Mitchell were each fined $62,000 ($1,000 for each of the 62 individual contemptuous acts). A fine of $6,200 was imposed on petitioner Stanich ($100 for each contempt). Additionally, all three were sentenced to six months in the county jail for each of the 62 acts, said terms to be served concurrently.

After ordering this sentence, the trial court purported to pronounce an alternative order and sentence, to become effective "if the Court of Appeal should find that the defendants should have been sentenced under section 1218 of the Code of Civil Procedure rather than section 11229 of the Penal Code . . . ." (Code Civ. Proc., § 1209 et seq.) Under the alternative order petitioners were each sentenced to five days in the county jail for each of the separate contemptuous acts, thirty-six of which terms were made consecutive, the remainder concurrent, for a total sentence of six months. The alternative order contained no monetary penalty.

## II. *The Relevant Contempt Statutes*

At the outset, we briefly review California's various statutory contempt provisions and the ways in which they interrelate and differ.

In 1872 the Legislature created two general classifications of contempt, both of which exist today in slightly amended form. Code of Civil Procedure section 1209 et seq. covers both "direct" and "indirect" contempts of court (*id.*, §§ 1211, 1212), and is the basis for the garden-variety general contempt of court finding in this state. It lists as contempt, inter alia, the following conduct: "1. Disorderly, contemptuous, or insolent behavior toward the judge while holding the court, tending to interrupt the due course of a trial or other judicial proceeding; [¶] 2. A breach of the peace, boisterous conduct, or violent disturbance, tending to interrupt the due course of a trial or other judicial proceeding; . . . [¶] 4. Abuse of the process or proceedings of the court . . . ; [¶] 5. *Disobedience of any lawful judgment,*

*order, or process of the court;* . . . [¶] 8. Any other unlawful interference with the process or proceedings of a court; . . ." (Code Civ. Proc., § 1209, subd. (a), italics added.)

For a finding of contempt under Code of Civil Procedure section 1209, the contemner may be punished by a fine of not more than $1,000,[6] and/or imprisonment in the county jail for not more than five days. (Code Civ. Proc., § 1218.)

■■■ It has long been established that the Code of Civil Procedure contempt statute triggers neither a state constitutional nor statutory right to a jury trial. (See Cal. Const., art. I, § 16; Code Civ. Proc., §§ 1211, 1218 ["the court or judge" tries the contempt]; *Safer* v. *Superior Court* (1975) 15 Cal.3d 230, 241 [124 Cal.Rptr. 174, 540 P.2d 14]; *Bridges* v. *Superior Court* (1939) 14 Cal.2d 464, 477-478 [94 P.2d 983], revd. on other grounds *sub nom. Bridges* v. *California* (1941) 314 U.S. 252 [86 L.Ed. 192, 62 S.Ct. 190, 159 A.L.R. 1346]; *In re Morelli* (1970) 11 Cal.App.3d 819, 850 [91 Cal.Rptr. 72]; *Pacific Tel. & Tel. Co.* v. *Superior Court* (1968) 265 Cal.App.2d 370, 373-375 [72 Cal.Rptr. 177].)

The other major classification of contempt codified in 1872 is found in section 166, which covers some of the same conduct included in Code of Civil Procedure section 1209, i.e., "1. Disorderly, contemptuous, or insolent behavior committed . . . in immediate view and presence of the Court, and directly tending to interrupt its proceedings . . . ; [¶] 2. Behavior of the like character committed in the presence of any referee . . . ; [¶] 3. Any breach of the peace, noise, or other disturbance directly tending to interrupt the proceedings of any Court; [¶] 4. *Willful disobedience of any process or order lawfully issued by any Court;* . . ." (§ 166, italics added.)

For a finding of contempt under section 166, the contemner "is guilty of a misdemeanor" and may be punished by a fine of not more than $1,000, and/or confinement in the county jail for not more than six months. (§ 19.)[7]

In contrast to those prosecuted for contempt under the Code of Civil Procedure, persons prosecuted for contempt under section 166, which by its express terms is a misdemeanor, have a state constitutional and statutory right to a jury trial. (*Mills* v. *Municipal Court* (1973) 10 Cal.3d 288, 298, fn. 8 [110 Cal.Rptr. 329, 515 P.2d 273] ["our state Constitution guarantees *every* defendant faced with misdemeanor or felony charges a right to trial by jury" (italics in original)]; *Tracy* v. *Municipal Court* (1978) 22 Cal.3d 760, 766 [150 Cal.Rptr. 785, 587 P.2d 227], and cases cited ["A person charged

---

[6] At the time of the contempts in this case, Code of Civil Procedure section 1218 authorized a $500 fine.

[7] At the time of the contempts in this case, section 19 authorized a $500 fine.

with a misdemeanor is entitled to . . . a trial by jury (Pen. Code, § 689)."];
*Safer* v. *Superior Court, supra,* 15 Cal.3d at pp. 239, 241 ["the defendant facing a Penal Code [section 166] prosecution has the right to trial by jury"].)

In addition to these original statutory forms of contempt, in 1913 the Legislature created a separate classification of contempt—violation of a court-ordered injunction issued under the RLAL. (Stats. 1913, ch. 17, pp. 20-22, codified in 1953 as § 11225 et seq.) "Any violation or disobedience of an injunction or order expressly provided for by this article is punishable as a contempt of court by a fine of not less than two hundred dollars ($200) nor more than one thousand dollars ($1,000), by imprisonment in the county jail for not less than one nor more than six months, or by both." (§ 11229.)

Whether there is a right to trial by jury under section 11229 of the RLAL has not previously been determined. We turn next to petitioners' claim that such right is established by the jury trial guarantee of our state Constitution. (Cal. Const., art. I, § 16.)

### III. *State Constitutional Right to Jury Trial for Contempts Under the RLAL (§ 11229)*

██ Because a defendant in a contempt proceeding under section 11229 faces a potential sentence of six months' imprisonment and a $1,000 fine—a sentence equivalent to that of many misdemeanors—we conclude that the California Constitution guarantees the defendant the right to a jury trial in such a proceeding. Conduct made so punishable under section 11229 is the functional equivalent of a misdemeanor, notwithstanding the apparent legislative intent that it be designated as a civil contempt. Our state Constitution guarantees a right to trial by jury in all criminal prosecutions for offenses above the grade of infraction. (*Mills* v. *Municipal Court, supra,* 10 Cal.3d 288, 298, fn. 8; § 19c ["An infraction is not punishable by imprisonment. A person charged with an infraction shall not be entitled to a trial by jury."].)

██ There is a fundamental difference between the reach of the federal and state constitutional guaranties of the right to a jury trial. As interpreted by the United States Supreme Court, the Sixth Amendment to the United States Constitution requires a jury trial for all "serious" crimes, including punitive[8] contempts. A term of imprisonment, in and of itself, will render

---

[8] Contrary to the People's suggestion, the sanctions imposed here were not remedial, but punitive. Petitioners were sentenced to a substantial fine and six months in jail. Under the contempt order they could not avoid these penalties, no performance on their part would purge the contempt, and the fines were not calculated to compensate for actual injury to the

such an offense "serious"—and hence trigger a right to jury trial—if the *authorized* term of imprisonment is greater than six months. (*Blanton* v. *City of North Las Vegas* (1989) 489 U.S. 538, __ [103 L.Ed.2d 550, 555-556, 109 S.Ct. 1289]; *Muniz* v. *Hoffman* (1975) 422 U.S. 454, 476 [45 L.Ed.2d 319, 335, 95 S.Ct. 2178]; *Taylor* v. *Hayes* (1974) 418 U.S. 488, 495-496 [41 L.Ed.2d 897, 905-906, 94 S.Ct. 2697]; *Bloom* v. *Illinois* (1968) 391 U.S. 194, 201-208 [20 L.Ed.2d 522, 528-533, 88 S.Ct. 1477]; *Cheff* v. *Schnackenberg* (1966) 384 U.S. 373, 380 [16 L.Ed.2d 629, 634, 86 S.Ct. 1523] (opn. of Clark, J.).) If a statute authorizes a sentence of six months or less, however, the sentence is "presume[d] for the purpose of the Sixth Amendment" (*Blanton, supra,* 489 U.S. at p. __ [103 L.Ed.2d at p. 556]) to be "petty" rather than "serious." In that situation, no right to jury trial arises unless something more—e.g., a fine of sufficient magnitude—makes the offense "serious." (See *id.,* at p. __ [103 L.Ed.2d at p. 557].)[9]

In contrast to the federal jury trial guaranty, which draws a distinction between "serious" and "petty" criminal offenses and requires a jury trial only for those offenses which fall into the "serious" category, the right to trial by jury embodied in the California Constitution extends to so-called "petty" as well as to "serious" criminal offenses, i.e., to all misdemeanors as well as to all felonies. Under the California Constitution, only infractions not punishable by imprisonment (§ 19c) are not within the jury trial guaranty. (*Mills* v. *Municipal Court, supra,* 10 Cal.3d at p. 298, & fn. 8.)

The *Mills* court's unanimous construction of article I, section 16, of the California Constitution reflects the clear intent of the drafters that the right to jury trial be preserved for any defendant who might be imprisoned for a criminal offense. The constitutional history demonstrating this intent also makes it clear beyond cavil that the "serious-petty offense" distinction adopted by the United States Supreme Court for purposes of the Sixth Amendment right to jury trial was in substance rejected when the 1879 Constitution was adopted.

The scope and content of the current state constitutional jury trial provision were debated extensively at the 1879 California Constitutional Conven-

---

state or public. Although it could be expected that the judgment would encourage petitioners to comply with the injunction in the future, because the punishment arose from past acts and could not be modified by future behavior, the primary purpose was punitive, rather than remedial. (*Hicks* v. *Feiock* (1988) 485 U.S. 624, 631-635 [99 L.Ed.2d 721, 731-733, 108 S.Ct. 1423, 1429-1431] [discussing distinction between punitive and remedial sanctions]; *People* v. *Lombardo* (1975) 50 Cal.App.3d 849, 852-854 [123 Cal.Rptr. 755].)

[9] The *Blanton* court wrote: "A defendant is entitled to a jury trial in such circumstances only if he can demonstrate that any additional statutory penalties, viewed in conjunction with the maximum authorized period of incarceration, are so severe that they clearly reflect a legislative determination that the offense in question is a 'serious' one." (489 U.S. at p. __ [103 L.Ed.2d at p. 556].)

tion. (See 1 Debates and Proceedings, Cal. Const. Convention (1880) [hereafter Debates] pp. 294-305; 3 Debates, *op. cit. supra*, at pp. 1173-1176.) A review of those debates makes it clear that the proponents of the current jury trial provision rejected the suggestion that the nature of an accused's right to a jury trial should turn on the Legislature's designation of the charged offense as a felony or a misdemeanor, or the notion that a person "who is liable to be fined five hundred dollars or sent to the jail for six months" should not have the same right to a trial by jury as a person "who is to be sent to San Quentin." (1 Debates, *op. cit. supra,* at p. 295 [remarks of Mr. Barnes].)

Of all the provisions of the Declaration of Rights considered at the 1879 Constitutional Convention, section 7, pertaining to the right to jury trial, was the most vigorously debated. Proposals that would have allowed conviction by less than a unanimous jury, or that distinguished between types of criminal offenses based on the severity of punishment, were strongly denounced. In particular, the delegates disagreed with the notion that the right to jury trial should depend on the legislative characterization of an offense as a felony or misdemeanor, recognizing the potential for abuse inherent in a constitutional provision that made the right to trial by jury turn on the label given the offense by the Legislature.[10]

In short, the drafters expressed their intent that the right to trial by jury be preserved for any defendant who might stand to lose his liberty by a sentence of imprisonment, however short, be it in state prison or county jail, and regardless of whether the Legislature has labeled the offense a "misdemeanor" or "felony." They believed that the length of imprisonment to which an ordinary misdemeanant was subject was sufficiently severe so that any person charged with such an offense should be guaranteed the same right to a jury trial as those who faced more serious charges.

---

[10]Typical of the beliefs of many delegates are the remarks of Mr. Barbour: "Gentlemen have attempted to draw a line here between certain grades of crimes, applying one system of jury trials to one grade of offenses, and another system to another grade. The committee have drawn this line in their report, or attempted to—felonies and misdemeanors in the one case, and in the other case specifying the amount of punishment as the line of demarcation. Gentlemen should remember, and the committee should have remembered that this thing of felony, and this thing of misdemeanor, are matters entirely within legislative control. They can make the lesser out of the greater if they see fit. If a crime is now a misdemeanor, the Legislature can make it a felony. We know they have done so, and they may do it again." (1 Debates, *op. cit. supra,* at p. 302.)

Even Mr. Howard, a proponent of abolition of the right to jury trial, expressed doubts about distinguishing between the rights of defendants in criminal trials based solely on the category of offense: "Again, in relation to the majority rule in cases of misdemeanor, I confess I have my doubts, because liberty appears as sweet to a man who has committed a misdemeanor as it is to a man who commits a higher offense." (*Id.*, at p. 296.)

It is true, of course, that when the 1879 Constitution was adopted, the statutory predecessor to the general contempt provisions of Code of Civil Procedure section 1209 had long been in existence and authorized a court to impose up to a five-day sentence in a contempt proceeding in which the defendant enjoyed no right to a jury trial. (See Stats. 1851, tit. XIII, § 488, p. 128.) Because there is no indication that the drafters of the 1879 Constitution intended to alter that general, summary contempt procedure, we early held that a defendant enjoys no constitutional right to a jury trial in a Code of Civil Procedure section 1209 proceeding. (See, e.g., *Bridges* v. *Superior Court, supra,* 14 Cal.2d 464, 477-478.)

At the same time, however, nothing in the debates leading to the adoption of the 1879 Constitution suggests that the proponents of the state constitutional jury trial provision contemplated that the right to trial by jury would not apply in a proceeding which carried a punishment indistinguishable from that imposed on a misdemeanant, even if the Legislature denominated the proceeding as one for contempt. At the time the 1879 Constitution was adopted, section 166—the current misdemeanor contempt provision—was also already in existence, demonstrating a recognition that when the state seeks to punish a contempt of court with a substantial sentence comparable to a misdemeanor sentence, the contempt should be treated as a misdemeanor and the alleged contemner afforded a jury trial. Given the existence in 1879 of our contemporary *misdemeanor* contempt provision, it cannot be persuasively maintained that when our state constitutional jury-trial provision was adopted, there was an implicit understanding that the nature of a contempt charge itself would render a trial by jury inappropriate.

Accordingly, in view of the clear intent of the drafters of the California Constitution to afford the right to jury trial in all misdemeanor, as well as all felony proceedings, we conclude that because a proceeding under section 11229 of the RLAL carries a maximum penalty comparable to a misdemeanor, the right to a jury trial afforded by article I, section 16 of our state Constitution applies to such a proceeding. Because defendants were not accorded a jury trial, the judgment of contempt under section 11229 must be annulled. Therefore we need not resolve petitioners' further claims that they were entitled to a trial by jury under the Sixth Amendment to the United States Constitution, and that principles of equal protection (U.S. Const., 14th Amend.; Cal. Const., art. I, § 7, & art. IV, § 16) guarantee a jury trial in section 11229 contempt proceedings because

similarly situated contemners prosecuted under section 166 are granted a jury trial.[11]

## IV. Number of Separate Contempts Chargeable Under Section 11229 of the RLAL

Petitioners argue that imposition of judgment for 62 individual acts of contempt was improper. They assert that the contempts found by the trial court were part of a continuous course of conduct that may not be punished more than once. They rely, in part, on section 654, which provides: "An act or omission which is made punishable in different ways by different provisions of this code may be punished under either of such provisions, but in no case can it be punished under more than one . . . ."

For purposes of retrial, we conclude that insofar as an injunction authorized under the RLAL is an injunction to abate a nuisance, namely, the maintaining of premises where prostitution and lewdness occur, persons who violate an injunction under the RLAL may properly be charged with

[11] We note that the high court in *Bloom* v. *Illinois, supra*, 391 U.S. 194, rejected the prior "broad rule that all criminal contempts can be constitutionally tried without a jury" (*id.*, at p. 197 [20 L.Ed.2d at p. 526]) in favor of the present rule guaranteeing the right to jury trial for criminal contempts subjected to "serious" rather than "petty" punishment. (*Id.*, at p. 198 [20 L.Ed.2d at p. 526].) Whether the punishments prescribed under section 11229 are sufficiently severe so as to render a finding of contempt under that section a "serious" offense for federal constitutional purposes is not so clear.

Under the Sixth Amendment, when a jail term alone is imposed the right to jury trial exists only if the actual imprisonment exceeds six months. (*Codispoti* v. *Pennsylvania* (1974) 418 U.S. 506 [41 L.Ed.2d 912, 94 S.Ct. 2687].) When no term of imprisonment is imposed, even very large fines levied against an entity such as a labor union have been deemed "petty." (*Muniz* v. *Hoffman* (1975) 422 U.S. 454 [45 L.Ed.2d 319, 335, 95 S.Ct. 2178].) No clear standards emerge from the federal cases as to the line of demarcation in a case such as this, in which the term of imprisonment does not exceed six months, but where in addition to the imprisonment a substantial fine is imposed. (Cf., *Muniz* v. *Hoffman, supra*, 422 U.S. 454; *Girard* v. *Goins* (8th Cir. 1978) 575 F.2d 160 [applying a flexible, ad hoc standard to determine the level of fine that makes an offense "serious," and deciding on a case-by-case basis whether a particular fine would be serious to a particular defendant]; and *United States* v. *Professional Air Traffic Controllers* (1st Cir. 1982) 678 F.2d 1 [applying the same test]; compare *United States* v. *McAlister* (10th Cir. 1980) 630 F.2d 772, 774 and *United States* v. *Hamdan* (9th Cir. 1977) 552 F.2d 276, 280 [statutes authorizing $1,000 fine requires jury trial, "ad hoc" approach of other circuits criticized]; see also *Maita* v. *Whitmore* (9th Cir. 1974) 508 F.2d 143, cert. den. 421 U.S. 947 [44 L.Ed.2d 100, 95 S.Ct. 1676] [where judge has discretion to impose more than a six-month term, it is the exercise of such discretion, rather than the authorized maximum term, which determines whether the offense is "petty" or "serious"]; *Blanton* v. *City of North Las Vegas, supra*, 489 U.S. 538 [103 L.Ed.2d 550] [implicitly holding that an authorized fine of $1,000, in combination with an authorized six-month term of imprisonment, does not require a jury trial].)

It seems probable that the cumulative contempt sentence which the trial court imposed in this case under section 11229—six-months' imprisonment and a substantial $62,000 fine— would trigger a right to a jury trial under current federal precedents.

only one count of contempt for each separate day they permit the enjoined nuisance to continue. Such a conclusion comports with the basic framework of the RLAL and the nature of an injunction issued under the aegis of that law.

At the outset we observe that section 654 is applicable to punishment for contempt. (*In re Farr* (1976) 64 Cal.App.3d 605, 613 [134 Cal.Rptr. 595].) However, before its impact may be determined, the court must ascertain how many separate contemptuous acts have occurred. The first question to be answered is not whether each of the acts of lewdness or prostitution by petitioners' employees is separately punishable, but how many contemptuous acts were committed by defendants in "allowing the occurrence, continuance or recurrence" of lewd acts at the theater subsequent to issuance of the injunction.

Section 11225, the initial provision of the RLAL, reads in relevant part: "Every *building* or place used for the purpose of illegal gambling . . ., lewdness, assignation, or prostitution . . . *is a nuisance which shall be enjoined,* abated and prevented, whether it is a public or private nuisance." (Italics added.) ██ Although the People claim that an injunction under the RLAL is aimed at the individual acts of lewd conduct or prostitution which occur on the designated premises, and therefore that each lewd act constitutes a separate violation of the injunction, prior cases which have specifically discussed the nature of an action under the RLAL conclude otherwise.[12]

Indeed, in this court's most recent decision under the RLAL—*People ex rel. Van de Kamp v. American Art Enterprises, Inc.* (1983) 33 Cal.3d 328, 334 [188 Cal.Rptr. 740, 656 P.2d 1170]—we specifically emphasized that " '[A]n action under the [Red Light Abatement Law] *is not one for the abatement of prostitution . . . but one for the abatement of a public nuisance* committed or maintained by the *habitual* practicing *in a building* or in or on any premises of acts of prostitution . . . .' " (Italics added and omitted.)

Although the RLAL does not itself specify how a court should compute the number of violations the contemner commits when he continues to

---

[12]The acts of lewdness, prostitution, etc., which cause a building to be a nuisance are themselves punishable as distinct crimes (§ 647, subds. (a) and (b)), and the RLAL does not purport to make the commission of those crimes the object of the injunctive relief or contempt proceedings authorized by the law. As a general rule a court may not enjoin criminal conduct and thereby deny the defendant a jury trial by punishing the violation as a contempt. (See *People v. Lim* (1941) 18 Cal.2d 872, 880 [118 P.2d 472]; *Sullivan v. S.F. Gas & Electric Co.* (1905) 148 Cal. 368 [83 P. 156]; but see *Perrin v. Mountain View Mausoleum Assn.* (1929) 206 Cal. 669 [275 P. 787] [exception recognized where the conduct is also a tort subject to an injunction].)

maintain a public nuisance in the face of an abatement or injunctive order, because the injunction authorized by the act is an injunction to abate a nuisance, it is reasonable to infer that the Legislature, when it adopted the RLAL in 1913, must have contemplated that a court would apply the then-existing general public nuisance provision in determining the number of violations. At the time the RLAL was adopted, section 373a provided—as it does today—that "the existence of such nuisance *for each and every day* after the service of such [abatement] notice *shall be deemed a separate and distinct offense* . . . ." (See Stats. 1903, ch. 147, § 1, p. 163, italics added.)

A number of this court's prior decisions under the RLAL reveal how the statute has been construed. In *Board of Supervisors* v. *Simpson* (1951) 36 Cal.2d 671, 674 [227 P.2d 14], for example, the court, in the course of a decision holding that the district attorney rather than the city attorney was the proper official to prosecute actions under the RLAL, explained that the RLAL "is penal in nature. . . . While actions to abate nuisances are considered civil in nature [citations] the abatement of houses of prostitution is in aid of and auxiliary to the enforcement of the criminal law. Such places are declared public nuisances. [Citation.] *Each and every day a public nuisance is maintained is a separate offense* and is a misdemeanor which it is the duty of the district attorney to prosecute by continuous prosecutions. (Pen. Code, § 373(a).)" (Italics added.)

While the quoted language from *Simpson* is dictum, it is indicative of the court's view that, as with other nuisances, continued violations of the RLAL would subject the violator to an additional penalty *for each day* that the violator permitted the nuisance to continue.

Other cases, although not directly addressing the issue, demonstrate that this is how the statute has traditionally been applied. For example, in *Selowsky* v. *Superior Court* (1919) 180 Cal. 404 [181 P. 652]—one of the earliest reported cases addressing a judgment of contempt under the RLAL—the affidavit initiating the contempt proceedings enumerated numerous acts of prostitution and solicitations to prostitution, but the defendant was charged with and found guilty of only one count of contempt for using "the premises for the purposes of lewdness, assignation and prostitution on or about" the specified day. (*Id.* at pp. 407-409.)

Similarly, in *Maita* v. *Whitmore, supra*, 508 F.2d 143, a decision rejecting a federal jury trial challenge raised by a defendant who had been found guilty of four counts of contempt under section 11229 but who had been sentenced to only six months in jail, the Ninth Circuit made clear that the four counts of contempt arose from "specific violations of the injunction occurring on each of four different days." (*Id.*, at p. 144.)

Indeed, when we consider both the amount of punishment authorized under section 11229 for *each* contempt violation—six months in jail and a $1,000 fine—and the principal mischief at which the RLAL was directed—the maintaining of a building as a nuisance—it seems clear that the Legislature could not reasonably have intended the nuisance abatement provision to authorize a separate *six-month* sentence on the owner of such premises for each lewd act and for each act of prostitution that occurred on the premises in a single day. If such sentences were authorized by the RLAL, they would be totally out of proportion to the sentence then prescribed for defendants convicted of the analogous crime of maintaining a disorderly house. (See Code, § 315, enacted 1872 ["[e]very person who keeps a house of ill-fame in this state, resorted to for the purposes of prostitution or lewdness, . . . is guilty of a misdemeanor"].)

The People cite *Reliable Enterprises, Inc.* v. *Superior Court* (1984) 158 Cal.App.3d 604, 620-622 [204 Cal.Rptr. 786], in support of their argument that each lewd act may constitute a separate contempt in a section 11229 prosecution. Their reliance is misplaced. The *Reliable Enterprises* court did not analyze the question of the number of contempts within the context of the RLAL at all, and simply viewed the injunction there at issue as one that forbade specific lewd acts, rather than one which enjoined the maintenance of a nuisance. Perhaps because the defendants in that case failed to refer to the applicable RLAL authorities, the *Reliable Enterprises* court did not cite or discuss either the provisions of section 373a, or the above-referenced passage from this court's decision in *Simpson.*

Accordingly, we conclude that the conduct with which petitioners were charged under section 11229 of the RLAL cannot support more than four separate contempt findings—reflecting the status of the premises as a nuisance on each of the four days on which petitioners permitted lewd acts to occur in the theater in violation of the injunction.[13]

Finally, because these four contemptuous acts are divisible temporally, and the Legislature has indicated an intent that punishment be authorized for each day that a nuisance of this type continues, on retrial section 654 would not preclude imposition of punishment for each of the four contempts. (See *People* v. *Beamon* (1973) 8 Cal.3d 625, 639 [105 Cal.Rptr. 681, 504 P.2d 905].)

---

[13] To the extent that it is inconsistent with this conclusion, *Reliable Enterprises, Inc.* v. *Superior Court, supra,* 158 Cal.App.3d 604, is disapproved.

### V. *Validity of the "Alternative" Order and Sentence Imposed Under Code of Civil Procedure Section 1209 Et Seq.*

As already noted, the trial court purported to pronounce an alternative order and sentence under Code of Civil Procedure sections 1209 and 1218, to take effect in the event that a reviewing court would conclude, as we do here, that the judgment cannot stand insofar as it rests on the initial order and sentence under the RLAL. The court's written order is as follows: "If the Court of Appeal should find that the defendants should have been sentenced under section 1218 of the Code of Civil Procedure rather than section 11229 of the Penal Code, IT IS THE ORDER OF THIS COURT that each defendant be sentenced to 5 days in the County Jail for each of the 62 separate contemptuous acts, 36 of said sentences to run consecutively to each other and the remainder to run concurrently, so that the defendants will each serve 180 days in the County Jail." No fine was imposed under this alternative order.

Because the effect of this "alternative" order and sentence was not discussed in the initial briefs, we requested supplemental briefing on the point. ■ Petitioners assert that section 11229 is the exclusive statute by which the People may prosecute violations of an injunction issued under the RLAL, and that the People may not proceed under Code of Civil Procedure section 1209 et seq. They argue that the RLAL is a specific statute designed to address a specific matter of great social import, and cite familiar cases holding that the People must prosecute under such specific, rather than general, statutes. (E.g., *People* v. *Gilbert* (1969) 1 Cal.3d 475, 479-481 [82 Cal.Rptr. 724, 462 P.2d 580]; *People* v. *Jenkins* (1980) 28 Cal.3d 494, 501-505 [170 Cal.Rptr. 1, 620 P.2d 587].) And petitioners urge that the trial court's imposition of an "alternative sentence" under Code of Civil Procedure section 1218 violates due process—as punishment for a violation of which they were neither charged nor tried.

The People in turn respond that "[t]here is no question that a contempt under the Red Light Abatement Act may be prosecuted under both the specific contempt provision in Penal Code section 11229 as well as the general contempt provisions in the Code of Civil Procedure." They further assert that, "a contempt action for violation of the Red Light Abatement order is identical to any other contempt action except for the penalty."

We conclude that no statutory obstacles preclude the People from exercising traditional prosecutorial discretion to proceed against a person who has allegedly violated a RLAL injunction under the less-serious general contempt provisions of the Code of Civil Procedure, which do not require a jury trial.

Although section 11229, the contempt provision of the RLAL, is more specific than the general contempt provision of Code of Civil Procedure section 1209, we cannot agree with petitioners' assertion that the People are thereby necessarily compelled to proceed against a person who has violated an injunction under the RLAL through a section 11229 rather than a Code of Civil Procedure section 1209 contempt proceeding.

The cases proffered by petitioners—*People* v. *Gilbert, supra*, 1 Cal.3d 475, 479-481, and *People* v. *Jenkins, supra*, 28 Cal.3d 494, 501-505—merely stand for the proposition that when the Legislature has enacted a specific statute addressing a specific matter, and has prescribed a sanction therefor, the People may not prosecute under a general statute that covers the same conduct, *but which prescribes a more severe penalty,* unless a legislative intent to permit such alternative prosecution clearly appears. (*People* v. *Woods* (1986) 177 Cal.App.3d 327, 333-334 [222 Cal.Rptr. 868].)[14] *Gilbert* and *Jenkins* do not purport to limit the People's discretion to prosecute under a general statute that provides a sanction *less severe* than that called for under a specific statute.

Similarly, we reject petitioners' alternative argument that provision of a one-month minimum sentence under section 11229 indicates legislative intent that section 11229 be the exclusive means of prosecuting violation of an injunction issued under the RLAL. Under this view the existence of a minimum sentence in a "specific" statute would preclude prosecutorial discretion to charge and seek sentencing under a lesser included, "general" statute prescribing a lesser penalty. Petitioners offer no evidence, however, that the Legislature intended to divest prosecutors of their commonly accepted charging authority in such situations. (See *United States* v. *Batchelder* (1979) 442 U.S. 114, 123-125 [60 L.Ed.2d 755, 764-766, 99 S.Ct. 2198] [prosecutor may elect to proceed under either of two statutes that proscribe the same conduct, but which prescribe different penalties]; Prosecutorial Discretion (Cont.Ed.Bar 1979) §§ 1.3, 1.16.) Thus, although we agree the Legislature clearly intended that a contemner who is sentenced to imprisonment under section 11229 receive a term of not less than one month in jail, we do not infer from this that the Legislature thereby intended to preclude prosecution and sentencing under the more lenient contempt-sentencing provisions of the Code of Civil Procedure.

---

[14] "Typically the issue whether a special criminal statute supplants a more general criminal statute arises where the special statute is a misdemeanor and the prosecution has charged a felony under the general statute instead. [Citations.] Such prosecutions raise a genuine issue whether the defendant is being subjected to a greater punishment than specified by the Legislature, and the basic question for the court to determine is whether the Legislature intended that the more serious felony provisions would remain available in appropriate cases." (177 Cal.App.3d at pp. 333-334.)

We also reject petitioners' assertion that when the People have the alternative of prosecuting a single act under two statutes, one of which provides for a trial by jury (but a potentially greater penalty), and the other of which provides for no jury trial (but a lesser penalty), they must prosecute under the offense affording the right to jury trial. Although there may be suggestive dictum to this effect in *Safer* v. *Superior Court, supra,* 15 Cal.3d 230, 241,[15] we have never so held. Neither petitioners, nor lower courts that appear to have embraced similar reasoning (e.g., *People* v. *Shults* (1978) 87 Cal.App.3d 101 [150 Cal.Rptr. 747]; *People* v. *Bowden* (1978) 86 Cal.App.3d Supp. 1, 6 [150 Cal.Rptr. 633]), offer a constitutional basis for that rule, and we decline to adopt it today.

■ We observe that in innumerable situations it has been recognized that a prosecutor generally has the discretion to charge a defendant with a "more general" lesser offense even when there is a "more specific" greater offense that might embrace the facts of the case. (See generally Prosecutorial Discretion, *supra,* § 1.16, at pp. 20-21.) Thus, for example, it has never been questioned that a prosecutor may charge a defendant with simple assault when the facts of which the prosecutor is aware would support an assault-with-a-deadly-weapon charge, or that a prosecutor may choose to charge a defendant with "straight" first degree murder even though the facts of the case could support a murder-with-special-circumstance charge. Although the Legislature presumably would have the power to specify that an individual who commits particular contemptuous conduct must be prosecuted under a particular statute or not at all, there would have to be a clear

---

[15] In *Safer*, the prosecution had instituted a section 166 misdemeanor action against farm workers for disobedience of an order restricting picketing. Rather than proceed to trial, the district attorney—who was not a party to the private civil action in which the injunction had issued—obtained dismissal of the criminal charges, and instead sought to proceed with a contempt action pursuant to Code of Civil Procedure section 1209. In *Safer* we held only that the People may not intervene in an otherwise private dispute, and prosecute a private party under Code of Civil Procedure section 1209 et seq., absent express legislative authority to do so. (15 Cal.3d at pp. 235-238.)

In dictum, we added: "While it is true that the penalty for contempt under Code of Civil Procedure section 1209 may be less than that under the Penal Code [section 166], the defendant facing a Penal Code prosecution has the right to trial by jury, a protection which the alleged contemnor prosecuted under the Code of Civil Procedure does not enjoy. . . . [¶] [The People's] attempted transformation of contempt proceedings brought under the Penal Code into a prosecution under the Code of Civil Procedure achieves a possible reduction of punishment only at the cost of a cherished protection. We hold that the district attorney does not have the power to force the defendants to make such an exchange. [Fn.]" (*Id.,* at p. 241.)

The omitted footnote reads: "We do not here rule on the propriety of a statute authorizing the district attorney to make such an election of remedies if the defendant were *not* thereby deprived of his right to trial by jury; if case law or legislation secured to defendants this right, another question might be presented. *We do not, however, face or decide this case today.* See footnote 7, *ante.*" (*Id.,* at p. 241, fn. 22, italics added.) In turn, footnote 7 of *Safer* expressly left open the question of whether, or under what circumstances, a jury trial might be constitutionally required under Code of Civil Procedure section 1209 et seq.

indication of such legislative intent before it would be appropriate to construe a statute like section 11229 to preclude a prosecutor from exercising his traditional discretion to charge a defendant with a less serious offense which the facts also support. (*People* v. *Woods, supra,* 177 Cal.App.3d at pp. 333-334.)

Our holding in the case of *In re Morris* (1924) 194 Cal. 63 [227 P. 914], is instructive on this point. In rejecting the proposition that an act of contempt punishable under Code of Civil Procedure section 1209 cannot at the same time constitute a specific criminal offense (§ 166) punishable under the Penal Code, we observed: "It was the plain intent of the legislature expressed in the cited code sections to give a double aspect to the wrongful acts there enumerated. In one aspect they are to be regarded as offenses against the dignity and authority of the court, remediable in accordance with the rules prescribed in the Code of Civil Procedure. In the other aspect they are to be regarded as offenses against the peace and dignity of the people of the state of California, and remediable as such in accordance with the rules prescribed in the Penal Code. . . . Plainly the legislature did not intend to . . . [divest a court of] the power to punish . . . [one who violates] its orders, but intended rather to provide an additional remedy which should be in a sense cumulative, and which should be available in the courts possessing the appropriate criminal jurisdiction." (*Id.,* at p. 69.)

■ We have concluded above that the prosecution may elect to proceed against a contemner in violation of a RLAL injunction under the less-serious general contempt provisions of section 1209. But because the penalties for RLAL contempts are substantially greater than those attaching to section 1209 contempts—thereby giving rise to a right to jury trial—we also conclude that due process requires the prosecution to afford the defendant fair notice of the nature of the penalties and proceedings he faces, by indicating, in the declarations filed initiating the contempt proceeding, the jurisdictional basis for the action.

■ Here, the prosecution proceeded exclusively under section 11225. Petitioners had a right to a jury trial from the very start of the proceedings, a right they sought to invoke and never waived. The Code of Civil Procedure contempt sections were never mentioned until after petitioners were found in contempt and the court recited its "alternative sentence and order." Petitioners were subject to a six-month term of imprisonment, and were so sentenced. Because petitioners were erroneously denied a jury trial at the initiation of the section 11225 proceedings, the resulting trial to the

court was null and void. For this reason, the "alternative sentence and order" is without any force and effect.[16]

## VI. *Findings That Acts of Contempt Were Lewd and Constituted Acts of Prostitution*

■ For guidance on retrial we address petitioners' further claim that the evidence was insufficient, under the criteria enunciated in *Pryor* v. *Municipal Court* (1979) 25 Cal.3d 238, 256 [158 Cal.Rptr. 330, 599 P.2d 636], to support findings that the various acts underlying the contempt judgment were lewd, or that the "performances" at the theater constituted acts of prostitution.

In *Pryor, supra*, 25 Cal.3d 238, we construed as synonymous the terms "lewd" and "dissolute" as they are used in section 647, subdivision (a), which prohibits "lewd or dissolute conduct in any public place or in any place open to the public or exposed to public view." (See *ante*, fn. 5.) We held that the conduct proscribed by that subdivision was that "which involves the touching of the genitals, buttocks, or female breast for the purpose of sexual arousal, gratification, annoyance or offense, if the actor knows or should know of the presence of persons who may be offended by his conduct. The statute prohibits such conduct only if it occurs in any public place or in any place open to the public or exposed to public view; it further prohibits the solicitation of such conduct to be performed in any public place or in any place open to the public or exposed to public view." (25 Cal.3d at pp. 256-257.)

The record refutes petitioners' suggestion that the trial court may have applied the wrong criteria in making its findings. The court discussed the criteria at length in the judgment of contempt, demonstrating its awareness and understanding of *Pryor*. Using that definition, the court found the numerous acts at issue to be lewd. The findings entered by the court

---

[16]The court's "alternative sentence and order" was flawed for yet another reason. As we have explained (pt. IV., *ante*, pp. 1245-1248), persons who violate an injunction under the RLAL may properly be charged with only one count of contempt under section 11229 for each separate day they permit the prohibited nuisance to continue. This limitation likewise applies when the prosecution alternatively elects to proceed against a person who has violated a RLAL injunction under the less-serious general contempt provisions of Code of Civil Procedure section 1209 et seq. This is so because an injunction issues under the RLAL to abate a nuisance; it does not purport to make the commission of the underlying acts of lewdness or prostitution—themselves separately punishable as distinct crimes—the object of the injunctive relief or contempt proceedings authorized under the RLAL. (*Ante*, p. 1246, fn. 12.)

Here, however, the court's "alternative sentence and order" erroneously found petitioners guilty of 62 separate acts of contempt, for which each petitioner received an aggregate 6-month sentence (36 consecutive 5-day terms, the remainder to be served concurrently).

detailing the onstage and offstage offensive acts support its lewdness determination.[17]

Petitioners further assert, however, that central to the *Pryor* test is a determination that the conduct at issue occur in a public place or a place open to the public or exposed to public view, and that there be an individual present who is likely to be offended by the conduct. Here, petitioners claim, the theater's advertising and lobby notices advised the public of the nature of the shows, and therefore ensured that no person entered the theater who would be offended. In addition, petitioners claim that because patrons paid a significant fee to attend shows which included live sex acts, such patrons expected to see—and would not be offended by—such acts. Finally, petitioners argue that in determining they were or should have been aware that persons who would be offended by the conduct might be present, the court erroneously concluded that a police officer could constitute an offended person.

We need not decide here whether, consistent with First Amendment principles, a police officer may be an "offended person" for purposes of determining whether particular conduct is lewd. Nor need we decide whether the posting of signs or warnings might ever suffice to establish, under *Pryor*, that defendants did not know or have reason to know of the "presence of persons who may be offended."

The evidence supports both the court's conclusion that the signs posted here did not adequately warn patrons of the conduct that was found to be lewd, and the court's finding that petitioners knew or should have known of the presence of patrons other than police officers who might be offended. The signs warned patrons that conduct prohibited by section 647, subdivisions (a) and (b), was forbidden, announced a "no-tipping" rule, warned that the material "exhibited deals frankly and explicitly with sexual matters," and requested those who might be offended not to patronize the theater. The trial court reasoned that these signs did not adequately advise patrons of the type of activity they would witness, noting that "not everyone who enters the [theater] would expect to be solicited or to participate or see other patrons engaged in oral copulation or digital intercourse, even though the majority may anticipate seeing some type of sexual activity."

The court's conclusions that the warnings given here did not ensure that persons who might be offended would not be present, and that defendants

---

[17] The onstage acts included actual (not simulated) oral copulation, digital intercourse, and the insertion of a dildo into the vagina of a performer. The offstage acts were those for which the customer gave the theater employee money and, immediately thereafter, the customer lewdly touched the employee.

knew or should have known of the presence of such persons, are fully supported by the evidence. Each of the acts detailed by the court was clearly lewd within the meaning of section 647, subdivision (a), and therefore constituted a violation of the injunction.[18]

### VII. *Sufficiency of the Evidence of Petitioners' Ability to Comply With the Injunction*

The evidence is also sufficient to support the trial court's conclusion that petitioners James Mitchell and Artie Mitchell had the ability to comply with the injunction. Petitioners admitted their ownership and control of the theater operations, policies, and employees. The trial court found petitioners had the power to order the employees to "tone down their act to the level of non-lewd conduct," but did not do so. Instead they merely placed "no-tipping" signs in two of the three theater rooms, placed the sign in the lobby advising prospective patrons of the explicit nature of the entertainment, and had the performers wear panties before mingling with patrons. The court found these actions to be token measures, rather than meaningful attempts to comply with the injunction.

The evidence does not, however, support a finding that petitioner Stanich had the ability to prevent occurrence of the lewd acts underlying violation of the injunction. The People's witnesses testified they observed Stanich at the theater, but there was no evidence that Stanich participated in decisions regarding the nature of the performances, or had authority over the employees. His role in the operation of the theater was simply not established by the evidence.

Nor does the judgment itself recite a basis for finding that Stanich had the ability to comply with the injunction. Although the judgment states that "defendants" had admitted ownership and control of "their" theater, its policies, and its employees, the reference is clearly to the Mitchells, not to Stanich. If directed to him, there is no evidence to support the recital inasmuch as Stanich did not admit ownership of the theater, control of policy, or authority over the employees, and was himself an employee.

---

[18] In view of this conclusion, it is unnecessary to decide petitioners' further claim that the trial court erred in concluding the conduct here alternatively constituted acts of prostitution within the meaning of section 647, subdivision (b). We note, however, the factual similarity of the present case to *People* v. *Maita* (1984) 157 Cal.App.3d 309 [203 Cal.Rptr. 685]. In that case, patrons of a theater that provided live nude entertainment would place money on the stage and thereafter engage in sexual acts with performers. The theater owner was convicted of multiple counts of pimping and pandering. Thereafter, in *People* v. *Freeman* (1988) 46 Cal.3d 419, 429-430 [250 Cal.Rptr. 598, 758 P.2d 1128], we approved the result in *Maita*, expressly noting that the payment by members of the audience for sexual acts with the performers constituted prostitution.

The People assert that Stanich's ability to comply with the injunction may be inferred. Stanich admitted in his declaration (accompanying the other petitioners' response to the order to show cause) that he was the manager of the theater and that it had always been the policy of the theater to present sexually explicit performances. The declaration also supports an inference that he set policy governing the behavior of the employees and the tipping practices.

In a contempt proceeding resulting in punitive sanctions (see *ante,* fn. 8), however, guilt must be established beyond a reasonable doubt. (E.g., *Feiock, supra,* 485 U.S. 624, 632, fn. 5 [99 L.Ed.2d 721, 732.]) A reviewing court will uphold a contempt judgment only if there is substantial evidence to sustain the jurisdiction of the trial court. (*In re Coleman* (1974) 12 Cal.3d 568, 572-574 [116 Cal.Rptr. 381, 526 P.2d 533].) The judgment here does not reflect a finding by the trial court that Stanich individually had the ability to comply with the injunction, and the record allows only speculation on that issue.[19] In the review of a contempt proceeding "the evidence, the *findings,* and the judgment are all to be strictly construed in favor of the accused [citation], and no intendments or presumptions can be indulged in aid of their sufficiency. [Citation.] If the record of the proceedings, reviewed in the light of the foregoing rules, fails to show affirmatively upon its face the existence of all the necessary facts upon which jurisdiction depended, the order must be annulled." (*Hotaling* v. *Superior Court* (1923) 191 Cal. 501, 506 [217 P. 73, 29 A.L.R. 127], italics added.)

Even were we to read the court's statement that the "defendants" had the ability to comply with the injunction as being directed to Stanich as well as the Mitchells, in the absence of any evidence of Stanich's ownership interest in the theater, duties or authority, a conclusion that he had the ability to comply with the injunction could not be sustained. As to Stanich, therefore, the judgment must be annulled and retrial is barred. (*Burks* v.

---

[19] The only evidence to which the People draw our attention, other than the declaration, is the testimony of a security officer employed by the theater. That employee stated he was under instructions to report illegal activity by the employees. He also testified that he reported to the night manager (who reported to Stanich), and that he could have reported directly to Stanich. The same witness testified he saw Stanich in the theater each evening when the witness came to work and that Stanich had a business office on the second floor.

The People also rely on testimony by the security officer that after he reported to Stanich regarding one woman's conduct, he did not see the woman in the employ of the theater again. That testimony was not, however, sufficient to support a conclusion that the employee was fired, or that, if so, she was fired on Stanich's authority. In fact, the witness testified that he had reported eight or ten women to Stanich for the same conduct, but there was no evidence that any of these women had been fired by Stanich.

*United States* (1978) 437 U.S. 1 [57 L.Ed.2d 1, 98 S.Ct. 2141]; *People* v. *Pierce* (1979) 24 Cal.3d 199, 210 [155 Cal.Rptr. 657, 595 P.2d 91].)[20]

## VIII. *Conclusion*

The judgment of contempt as it applies to petitioner Stanich is annulled, and the superior court is directed to dismiss the proceeding as to him.

The judgment of contempt is annulled as to petitioners James Mitchell and Artie Mitchell, and the matter remanded for further proceedings consistent with the views expressed herein.

Broussard, J., and Kaufman, J., concurred.

**MOSK, J.,** Concurring.—I concur in the result of the majority opinion. However, I cannot agree with its criticism and evasion of a controlling decision of this court: *Safer* v. *Superior Court* (1975) 15 Cal.3d 230 [124 Cal.Rptr. 174, 540 P.2d 14] (hereafter *Safer*). Stare decisis requires a better fate for an authoritative opinion.

There is no question that a prosecutor may choose to charge a defendant under either Penal Code section 11229 or Code of Civil Procedure section 1209 "if the defendant were thereby deprived of his right to trial by jury" (*Safer*, 15 Cal.3d at p. 241, fn. 22). That is typical prosecutorial discretion.

However, the prosecutor may not make that election for the purpose of depriving a defendant of his constitutional right to a jury trial. As this court declared in *Safer, supra*, 15 Cal.3d at page 241, "the attempted transformation of contempt proceedings brought under the Penal Code into a prosecution under the Code of Civil Procedure achieves a possible reduction of punishment only at the cost of a cherished protection," i.e., the right to a jury trial. We concluded, "We *hold* that the district attorney does not have the power to force defendants to make such an exchange." (*Ibid.*, italics added.)

The majority cavalierly brush *Safer* aside as mere dictum, despite its *holding*. Theirs is a strategic editorial device: to avoid the impact of a controlling opinion, they pronounce it to be mere dictum and then ignore it

---

[20] This conclusion makes it unnecessary to consider Stanich's assertion that the failure to name him in the order to show cause, and to serve the order on him, constituted a jurisdictional defect in the proceedings. We note, however, that he had notice of the injunction, and at a time when the pleadings had been amended to name him, appeared and defended. Under analogous circumstances jurisdiction has been affirmed. (See *Leonis* v. *Superior Court* (1952) 38 Cal.2d 527, 531 [241 P.2d 253].)

by deciding directly to the contrary. Such technique might be tolerable in some relatively trivial instances, but not when the constitutional right to a jury trial is involved.

Other cases have reached a conclusion similar to that in *Safer.* For example, in *People* v. *Shults* (1978) 87 Cal.App.3d 101, 108 [150 Cal.Rptr. 747], the court held that the striking of prior convictions, thus reducing the offense to be tried, "may not have the effect of depriving appellant of his right to a jury trial . . . ." In *People* v. *Bowden* (1978) 86 Cal.App.3d Supp. 1, 6 [150 Cal.Rptr. 633], it was held that "a court cannot, for its convenience or even for some more worthy motive, deny a defendant a jury trial by the device of dismissing [one charge for another] based on the same facts . . . ."

Except for their treatment of the California constitutional right to a jury trial—a right more comprehensive than that provided in cases interpreting the federal Constitution—the majority reach the correct disposition of this case on its facts.

**LUCAS, C. J.,** Concurring and Dissenting.—I concur in the judgment insofar as the majority holds the judgment of contempt under Penal Code section 11229 (the Red Light Abatement Law) must be annulled. (Maj. opn., *ante,* at p. 1244 & fn. 11.) Without belaboring the issues further, I note simply that I dissent from the majority's holding that on retrial, petitioners may be charged with only one count of contempt for each day on which they permitted multiple lewd acts to occur in violation of the injunction. Nor can I subscribe to the majority's analysis concerning the "alternative sentence."

**PANELLI, J.,** Concurring and Dissenting.—With the exception of the majority's analysis and conclusion on the "alternative order" issue, I concur in the judgment.

The majority holds imposition of sentence under Code of Civil Procedure section 1209 et seq. violates due process because petitioners were neither charged nor tried under that section. (Maj. opn., *ante,* at pp. 1249-1253.) The majority cites no authority for this conclusion. However, it appears to me, that one who commits a Penal Code section 11229 contempt necessarily also commits a contempt under Code of Civil Procedure section 1209, subdivision (a) 5; the former is the violation of a specific court order, and the latter is the violation of "any" court order. Moreover, I fail to see how the seven-day court trial *in this case* would have been different had the

parties been notified and proceeded from the start of this litigation under the Code of Civil Procedure; the same procedures, protections and standard of proof applied. Accordingly, I cannot imagine in what way petitioners' due process rights might have been prejudiced in this case.

The petition of real party in interest for a rehearing was denied February 1, 1990. Panelli, J., was of the opinion that the petition should be granted.