37 Cal.App.4th 1081 (1995)
44 Cal. Rptr. 267
In re ROBERT B. CASSIL et al. on Habeas Corpus.
ROBERT B. CASSIL et al., Petitioners,
v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
CLAYTON R. COOK, Real Party in Interest.
Docket No. B092152.
Court of Appeals of California, Second District, Division Five.
August 16, 1995.
*1083 COUNSEL
Richard I. Singer and Elvi J. Olesen for Petitioners.
No appearance for Respondent.
Epport & Richman and Philip H.R. Nevinny for Real Party in Interest.
OPINION
TURNER, P.J.
Defendants, Robert B. Cassil and William F. Raymond, seek review of an order of the respondent court holding them in contempt for failure to comply with an order to transfer security deposits to a receiver. Because there was no substantial evidence defendants had the ability to comply with the order to transfer security deposits, we grant the habeas corpus and certiorari requests and annul the judgment of contempt.

FACTS AND PROCEDURAL HISTORY
Defendants purchased the Ocean Center Building located at 110 West Ocean Boulevard in Long Beach in 1975. In 1989, they borrowed $4.5 million from plaintiff, Southern California Federal Savings and Loan Association. The loan was secured by a trust deed on the building. In 1994, defendants failed to make payments due under the terms of the lending agreement. Plaintiff filed a judicial foreclosure action and on July 28, 1994, secured the appointment of Clayton R. Cook as the receiver. On July 28, 1994, a temporary restraining order was issued which directed defendants to turn over tenant security deposits in their possession. It is this order which resulted in the judgment of contempt which is the subject of this extraordinary writ proceeding. The July 28, 1994, order stated: "Defendants, and each of them, and their respective agents, employees, partners, and all other persons in concert with them, are ordered to immediately turn over to the Receiver any monies (including, but not limited to, security deposits ... for the Property) which represent rental or lease payments with respect to the Property, which are received, or have been received by defendants." Further, the lengthy order prohibited defendants from interfering directly or indirectly with the receiver's performance of his duties.
On February 22, 1995, the respondent court, in response to a request by the receiver, issued an order to show cause regarding contempt directed at defendants. A hearing was held on March 8, 1995, in response to the order to show cause. The evidence at that hearing, which included declarations, *1084 indicated the following. On August 2, 1994, the receiver requested in a letter that defendants turn over the tenant security deposits as required by the July 28, 1994, temporary restraining order. The letter directed that the receiver be provided with, "All security deposits being held with itemized list of each tenant's deposit." Defendants did not respond to the receiver's August 2, 1994, letter. On January 17, 1995, the receiver sent a letter to one of defendants, Mr. Cassil. After discussing other issues concerning certain specific deposits, the January 17, 1995, letter stated: "I am hereby making another demand for the turnover of all the tenants' deposits. I need those deposits to be in my possession no later than January 20, 1995. If you fail to respond to this request and turn over the deposits as demanded, I will notify the Court that you have failed to respond to the Court Order and the directions given to you by the Receiver." Enclosed with the January 17, 1995, demand for transfer of the tenant security deposits was a copy of the aforementioned August 2, 1994, letter.
At the hearing, the receiver testified he mailed the January 17, 1995, letter to "defendants." On January 20, 1995, Mr. Cassil's attorney responded to the January 17, 1995, letter in part as follows: "Now with respect to the merits of your request, the original court order appointing a receiver merely requires my clients to turn over to the receiver any security deposits or unpaid rent on hand. In fact, it would have been improper for the court to do more. It could not have ordered my clients to turn over deposits which they have already spent and are not in their possession as that would have been beyond its jurisdiction. [¶] There are no deposits on hand. Any security deposits or prepaid rent have been expended by my clients long ago." The receiver also testified he had a list of the security deposits for the Ocean Center Building. That list was based on the leases maintained for the property. As of the date of his testimony, defendants had failed to deliver $59,939.65 worth of deposits "on behalf of existing tenants." When cross-examined, the receiver admitted he had "[v]ery little" knowledge concerning the operating history of the building.
The building manager, Susan Montgomery, testified she compiled a list of the deposits for the property in question. She compiled the list identified by the receiver as follows: "I took those figures from the lease documents themselves. There's a specific section on the lease document that states the security deposit that is on file with the particular tenant." The leases were in a file cabinet in her office and the figures as to the amount of the security deposits testified to by her and the receiver were from those rental agreements. Based on her review of the leases, she computed that $59,939.65 had not been turned over to the receiver by defendants. Ms. Montgomery admitted the security deposits were not kept in a "segregated account." Prior to her *1085 becoming the manager, Ms. Montgomery was aware that the building was in financial "trouble." Some of the tenants had been "in the building for years." Some of the tenants had been in the building for "over five years."
Mr. Cassil testified that in 1991, the building had a positive cash flow of "around $89,000." In 1992, there was a "loss of $46,000." In 1993, the building lost $179,000. The 1993 loss did not reflect that the building owners began to default on trust deed payments to plaintiff. In the first seven months of 1994, before the appointment of the receiver, the property lost $117,000. Security deposits were not placed in a segregated account. Rather, security deposits were placed "into the property account" and became part of "operating income." Mr. Cassil's declaration indicated the moneys from that account were utilized to pay "operating expenses and debt service." Mr. Cassil's declaration stated: "All security deposits received from tenants of the Property were spent long prior to July 28, 1994 in an effort to save the Property. There are no security deposits or proceeds thereof from the Property remaining in my possession or under my control and there were no such funds on July 28, 1994 and, in fact, all funds of every type and kind whatsoever which ever existed with respect to the Property have been completely exhausted...." Mr. Cassil's declaration stated, "On July 28, 1994, the date of the temporary restraining order ... neither I nor [Mr. Raymond] had in his possession, or under his control, any security deposits attributable to the Property." Mr. Cassil testified he and Mr. Raymond had "put everything we had into" the building.
Mr. Raymond did not testify. However, his declaration repeated the same evidentiary points articulated by Mr. Cassil including: the property had operated with a negative cash flow; the security deposits were used to pay operating expenses; all of the funds for the property had been expended; and as of the date of the temporary restraining order, all of the security deposits had been expended.
Both of the declarations submitted by Mr. Cassil and Mr. Raymond made indirect reference to other unspecified properties owned by them. The building in question was owned by Mr. Cassil and Mr. Raymond. They were the sole general partners in United Properties which "was the operating entity for the [p]roperty and for several other properties owned from time to time by ..." Mr. Cassil and Mr. Raymond. Defendants' declarations indicated: security deposits from "other properties operated by United Properties" were placed in the operating account; expenses, including debt service, were paid out of the operating account which received funds from their "other properties"; "for more than a year prior to July 28, 1994," the negative cash flow on the Ocean Center Building in Long Beach was funded *1086 in part from income from the "other properties" as well as "personal funds" advanced by Mr. Cassil and Mr. Raymond; and the Ocean Center Building was "substantially indebted to the United Properties Partnership and to other partnerships in which [defendants] are the general partners and to [defendants] individually because of loans made by those partnerships and [defendants]...."
During argument after the presentation of evidence, defendants' lawyer argued: "And there is no evidence before you that there's any ability to perform. And the party bringing this proceeding has the burden of proving beyond a reasonable doubt, each element of the offense, including the ability to perform." In finding defendants in contempt, the respondent court addressed the ability to comply issue as follows: "The essence of [defendants'] position is that there were no security deposits, i.e., they were spent prior to the appointment of the receiver.... Mr. Cassil also testified that essentially there never were any security deposits to speak of, because they had been absorbed into the operating account over the years and spent. Thus, according to [defendants], they were not able to comply with the turnover order, because there was nothing to turn over. Nevertheless, Exhibit B, for example, shows substantial security deposits collected which should have been in a special fund. Notwithstanding [defendants'] showing that there is no security deposit fund, as required by law ..., neither of them offered proof of inability to turn over the equivalent of the fund that should have been in existence. They have simply argued that there `are no deposits[.'] ... `Inability to comply' means just that. There is no evidence that [defendants] don't have money to turn over to the receiver in a sum representing the required security deposits, regardless of the source of that money. Based on the March 6, 1995 declarations of [defendants], it is reasonably inferable that they have, and had on July 28, 1994, access and/or ownership of `other properties' and `personal funds[.'] ... [Defendants] cannot rely on the argument that since they did not maintain a separate security deposit fund and since they spent the security deposits, therefore they do not have the ability to comply with the turnover order."

DISCUSSION
(1) We apply the following standard of review of a contempt order: "In a contempt proceeding resulting in punitive sanctions..., however, guilt must be established beyond a reasonable doubt. [Citation.] A reviewing court will uphold a contempt judgment only if there is substantial evidence to sustain the jurisdiction of the trial court." (Mitchell v. Superior Court (1989) 49 Cal.3d 1230, 1256 [265 Cal. Rptr. 144, 783 P.2d 731]; see New York Times Co. v. Superior Court (1990) 51 Cal.3d 453, 459 [273 Cal. Rptr. *1087 98, 796 P.2d 811]; In re Coleman (1974) 12 Cal.3d 568, 572 [116 Cal. Rptr. 381, 526 P.2d 533].) Our Supreme Court has noted: "In the review of a contempt proceeding `the evidence, the findings, and the judgment are all to be strictly construed in favor of the accused [citation], and no intendments or presumptions can be indulged in aid of their sufficiency. [Citation.] If the record of the proceedings, reviewed in the light of the foregoing rules, fails to show affirmatively upon its face the existence of all the necessary facts upon which jurisdiction depended, the order must be annulled.' [Citation.]" (Mitchell v. Superior Court, supra, 49 Cal.3d at p. 1256, italics omitted.) (2a) We conclude there was no substantial evidence of an ability on the part of defendants to comply with the turnover order of July 28, 1994, with their other financial resources. Accordingly, we annul the judgment of contempt.
We first address the question of whether the receiver had the burden of proving defendants had the ability to comply with the turnover order. The receiver argues that the burden of proof rested with defendants to demonstrate they could not comply with the turnover order. (3) An element of an indirect contempt is that the person subject to the order has the ability to comply with the order. (Mitchell v. Superior Court, supra, 49 Cal.3d at p. 1256; Conn v. Superior Court (1987) 196 Cal. App.3d 774, 784 [242 Cal. Rptr. 148]; Coursey v. Superior Court (1987) 194 Cal. App.3d 147, 154 [239 Cal. Rptr. 365]; Reliable Enterprises, Inc. v. Superior Court (1984) 158 Cal. App.3d 604, 616, fn. 3 [204 Cal. Rptr. 786] disapproved on another point in Mitchell v. Superior Court, supra, 49 Cal.3d at p. 1248, fn. 13; Ramirez v. Superior Court (1977) 72 Cal. App.3d 351, 354-355 [140 Cal. Rptr. 108]; In re Ny (1962) 201 Cal. App.2d 728, 731 [20 Cal. Rptr. 114]; Nutter v. Superior Court (1960) 183 Cal. App.2d 72, 75 [6 Cal. Rptr. 404].) When a contempt is classified as punitive in nature, the Fourteenth Amendment due process clause requires the moving party prove its case beyond a reasonable doubt. (United Mine Workers v. Bagwell (1994) ___ U.S. ___, ___ [129 L.Ed.2d 642, 651, 114 S.Ct. 2552, 2556]; Hicks v. Feiock (1988) 485 U.S. 624, 632 [99 L.Ed.2d 721, 731-732, 108 S.Ct. 1423]; Gompers v. Bucks Stove & Range Co. (1911) 221 U.S. 418, 444 [55 L.Ed. 797, 807, 31 S.Ct. 492].) A punitive contempt for due process purposes occurs when a fixed term of incarceration or fine is set by the court. (United Mine Workers v. Bagwell, supra, ___ U.S. at p. ___ [129 L.Ed. at p. 653, 114 S.Ct. at p. 2558]; Hicks v. Feiock, supra, 485 U.S. at pp. 631-632 [99 L.Ed.2d at pp. 731-732]; Gompers v. Bucks Stove & Range Co., supra, 221 U.S. at p. 442-443 [55 L.Ed. at p. 806]; Mitchell v. Superior Court, supra, 49 Cal.3d at pp. 1241-1242, fn. 8.) (2b) The present sentences were for a fixed term of five days and the fines were of a sum certain, $1,000. As a result, the present contempt order was punitive and the due process clause required the receiver to prove *1088 defendants had the ability to comply with the turnover order.[1] (Id. at p. 1256.)
Defendants argue they had no ability to transfer the security deposits to the receiver. Defendants reason that all of the security deposits had been placed in the building operating fund and had been spent. Defendants contend that since the security deposits were no longer in existence, there was no ability to comply with the July 28, 1994, order. The receiver argues that defendants are not completely excused from the duty to pay any moneys merely because the tenants' security deposits were expended prior to the commencement of the receivership. We agree that there were statutorily mandated duties in terms of the security deposits (Civ. Code, § 1950.7), as well as obligations owed under the trust deed. The receiver reasons that these statutorily and contractually mandated duties required defendants to expend their own moneys to pay the receiver for the security deposits.
However, we conclude there was no substantial evidence defendants had any moneys left to pay to the receiver in lieu of the security deposits. In other words, even if there was a duty on the part of defendants to utilize their own funds in an effort to comply with the turnover order, there is no substantial evidence any money existed. Mr. Cassil indicated he and Mr. Raymond had used all of their resources in the unsuccessful effort to operate the Ocean Center Building. The receiver presented no evidence to contradict that sworn testimony. There is no evidence any moneys existed on or after July 28, 1994, the date of the turnover order, which would have been available to pay to the receiver. Finally, there is no merit to the receiver's argument advanced at oral argument that his counsel was prevented in any way from proving that defendants had the ability to comply with the July 28, 1994, turnover order. Although the issue is quite close, the inferences arising from defendants' former wealth did not provide a basis for concluding they could have complied with the turnover order on or after July 28, 1994. Because it was the receiver's burden to demonstrate defendants had the ability to comply with the turnover order and there is no substantial evidence *1089 of such a state of affairs, the judgment of contempt must be reversed and annulled. (Mitchell v. Superior Court, supra, 49 Cal.3d at p. 1256.)

DISPOSITION
Let writs of habeas corpus and certiorari issue annulling the judgment of contempt. All parties are to bear their own costs in connection with the present extraordinary writ proceedings.
Armstrong, J., and Godoy Perez, J., concurred.
NOTES
[1] The receiver relies on various cases which hold that the person subject to the contempt judgment has the duty of proving an inability to comply with the order. (In re McCarty (1908) 154 Cal. 534, 537 [98 P. 540]; see Mery v. Superior Court (1937) 9 Cal.2d 379, 380 [70 P.2d 932].) However, these cases were filed prior to the series of United States Supreme Court decisions which held that the burden of proof rests with the moving party when a punitive contempt judgment is imposed. (United Mine Workers v. Bagwell, supra, ___ U.S. at p. ___ [129 L.Ed.2d at p. 653, 114 S.Ct. at p. 2558]; Hicks v. Feiock, supra, 485 U.S. at pp. 631-632 [99 L.Ed.2d at pp. 731-732]; Gompers v. Bucks Stove & Range Co., supra, 221 U.S. at pp. 442-443 [55 L.Ed. at p. 806].) Further, the California Supreme Court has held in the case of a punitive contempt the burden of proving ability to comply rests with the moving party based on the holding of Hicks v. Feiock, supra, 485 U.S. at pages 631-632 [99 L.Ed.2d at pages 731-732]. (Mitchell v. Superior Court, supra, 49 Cal.3d at p. 1256.)