Filed 10/7/16  P. v. Savala CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C075001 |
| Plaintiff and Respondent, | (Super. Ct. No. 12F04699) |
| v. | |
| DAVID MOSQUEDA SAVALA et al., | |
| Defendants and Appellants. | |

Sibling defendants David and Pebbles Savala, together with others, assaulted and kidnapped the victim, a 14-year-old girl.  They demanded she help them find a woman named Lillianna who owed Pebbles money.  They threatened to prostitute the victim if the hunt for Lillianna was unsuccessful.

The People charged defendants with aggravated kidnapping for financial gain under Penal Code section 209, subdivision (a) (section 209(a)),[1] assault with force likely to cause great bodily injury (§ 245, subd. (a)(4)), and other offenses. The People offered two theories to support the aggravated kidnapping for financial gain charge: (1) the kidnapping was to collect a debt; and (2) the kidnapping was for prostitution. The jury found both defendants guilty of assault and aggravated kidnapping. The trial court found true the allegations that David had a prior conviction that qualified as a strike (§§ 667, subds. (b)-(i) & 1170.12) and had served a prison term (§ 667.5, subd. (b)). The court sentenced David to life imprisonment with a minimum term of 14 years plus a determinate term of nine years. The court sentenced Pebbles to life with a minimum term of seven years plus a consecutive term of four years.

On appeal, both defendants challenge their aggravated kidnapping convictions on various grounds, including insufficiency of the evidence. Although, as we explain, we find the evidence sufficient to support the convictions under the debt collection theory, our initial review of the case revealed a problem with the People's reliance on the prostitution theory. We requested supplemental briefing on whether the rule of *In re Williamson* (1954) 43 Cal.2d 651, which we describe in detail *post*, foreclosed prosecution of kidnapping for prostitution as aggravated kidnapping for financial gain, given that there is a specific crime covering the same conduct--abduction for prostitution (§ 266a).

As we explain *post*, because the specific-over-general rule of *In re Williamson* precluded defendants' prosecution under one of the charged legal theories, and there is no basis to determine on which theory the jury based its verdict, the convictions for aggravated kidnapping must be reversed. (*People v. Green* (1980) 27 Cal.3d 1, 69, overruled on other grounds in *People v. Martinez* (1999) 20 Cal.4th 225, 239.)

---

[1] Further undesignated statutory references are to the Penal Code.

**FACTS**

*The Assault*

About 8:00 p.m. on July 4, 2012, the victim (14-years-old) made plans to meet her friends A.C., and M.A.  At the time, A.C. was living with defendant Pebbles Laura Savala (Pebbles) and the girls agreed to meet there.  When they arrived, there were a lot of people in the garage, including defendants David Mosqueda Savala (David) and Juan Omar Velasquez-Mosqueda (Omar).[2]  David is Pebbles' brother, and Omar is their cousin.  The victim was offered both beer and Ecstasy.  At trial she did not recall if she drank any beer; she claimed she put the Ecstasy pill in her pocket.

About 30 minutes after she arrived at Pebbles' house, the victim received a text message from her mother, telling her to come home.  She told A.C. about the message and A.C. asked the victim to come to her room.  They went to A.C.'s bedroom where A.C. asked the victim to wait.  A.C. came back in a few minutes and said, "[l]et's go."  They walked through the living room where there were a lot of people.

Pebbles asked the victim, "[W]hy are you talking about me?" and began hitting her.  David was holding a phone and recording the incident.  A.C., M.A., David, and Omar all hit the victim.  A.C. kicked her and A.C. and M.A. pulled the victim's hair.  Omar kicked her in her crotch.  He also tried to pull her pants down.  Pebbles asked the victim if she had talked to Edgar Mares, who was Pebbles' boyfriend and was then in jail.  Before he went to jail, the victim had a relationship with him.

*The Kidnapping*

David pushed the victim out the front door and they told her to go home.  The victim started walking; when she saw a van pull up beside her, she started running.  David was driving the van.  Omar and Pebbles got out of the van and Omar started chasing the victim.  The victim called to people nearby for help and Omar told them, "that's my bitch, let her go."  Omar grabbed the victim by her hair and put her in the van.

---

[2] Velasquez-Mosqueda separately appealed.  Because the Savalas share a surname, we refer to them by their first names.

3

He put her in the back seat next to a man the victim did not know. David and his girlfriend Suzie were seated in front; A.C., M.A., and Pebbles were in the middle seat; and Omar joined the victim in the back seat and held her down.

David told Omar to have sex with the victim, so the unknown man moved to the middle seat. Omar began touching the victim's thigh. He touched her vagina over her clothes and tried to put his hand down her bra. The victim told him to stop and he hit her in the jaw. Omar kept trying to touch the victim, but he finally stopped.

Pebbles and A.C. talked about going to the north area to find "Lillianna," who was an acquaintance of the group. Back at the house, Pebbles had said something about Lillianna owing her money. The victim knew Pebbles was mad at Lillianna and understood that Pebbles wanted to find Lillianna because Lillianna owed her money. Lillianna had lived with Pebbles and the victim had met her twice. Pebbles thought Lillianna might be with Anthony, who was M.A.'s boyfriend. Pebbles said she was going "to sell Lillianna," meaning to prostitute her. Pebbles also wanted to fight Lillianna. Pebbles told the victim that if they did not find Lillianna, " 'you are going to walk the blade for me.' " The victim understood "walk the blade" to mean Pebbles would make the victim work as a prostitute. Pebbles, A.C., and M.A. started talking about it. They wanted the victim to call Anthony to find out where he was so they could find Lillianna. She called and spoke with Anthony, but the call did not lead to finding Lillianna.

After driving around the north area for 25 to 30 minutes, they returned to Pebbles' house, where Pebbles took the victim to A.C.'s room. They stayed there until morning; the victim was never left alone.

In the morning Pebbles' sister Chena arrived. Pebbles took the victim with her as she and Chena ran errands. The last stop was at a mechanic's garage owned by Chena's uncle. Pebbles told him that the victim was her bitch and she wanted to sell her. The uncle laughed.

After they were back at Pebbles' house, Edgar called Pebbles from jail. After Pebbles spoke with him, she told the victim to talk to him. The victim spoke with Edgar twice. Pebbles was angry about the victim having sex with Edgar and was trying to find out exactly what they had done.

Pebbles, A.C., and M.A. told the victim to take a shower because she "was going to walk the blade." While the victim was showering, A.C. came in and tried to take a picture of her. A.C. said she was going to put the picture on "redbook," a website advertising prostitutes. When the victim got out of the shower, Omar tried to take her towel off. When she would not let him, he punched her in the face. The females chose clothes for the victim to wear, including shorts and high heels. Pebbles told the victim she had a nice body and would make a lot of money for them.

Chena returned, and later they all went to a house where Pebbles again said the victim was "her bitch" and she was going to make her "walk the blade." Daniel, Pebbles, Omar, and the victim drove to Watt Avenue where they were going to make the victim work as a prostitute.[3] They drove around for 15 to 20 minutes but it was "dead" with no one around, so they left. Pebbles received a phone call from A.C. and M.A. and then asked the victim if she wanted to go home. They dropped the victim at some apartments near her home and she walked home. Pebbles told the victim she knew where she lived and Pebbles had family who were gang members so the victim "better not snitch."[4]

*Arrest and Search*

Meanwhile, the victim's mother had been worried and had called the police. A police officer was on his way to her residence and arrived about 2:20 a.m. on July 6, shortly after the victim came home. The victim was sore, bruised, and her ear was swollen. A detective from the Crimes Against Children Task Force showed the victim

---

[3] A detective testified that area of Watt Avenue is the most prolific prostitution stroll in Sacramento.

[4] The jury deadlocked on a charge of witness intimidation (§ 136.1, subd. (c)) against Pebbles and the charge was dismissed.

photographic lineups and other pictures. The victim picked out photographs of Omar, Pebbles, David, Chena, and M.A.

The police had arrested David on July 5 on an unrelated matter. The police seized his cell phone and found a video of the victim being assaulted at Pebbles' house. David's computer showed numerous entries to the prostitution website myredbook.com on July 4 and 5.

*Recorded Jail Phone Calls*

The jury heard three recorded phone calls between Edgar and Pebbles made while Edgar was in jail.[5] The first was on July 4 just before 9:00 p.m. Pebbles told Edgar she was going to look for a girl that night who owed her money and she was "going to beat the fuck out of her." Pebbles said there were two people who owed her money; one owed her $800 and the other owed $250. She also told Edgar that "his girlfriend" (meaning the victim) was coming over and she was going to beat her up, too. Edgar said he wanted to talk to her when she got there. Pebbles said she was going to make the girl "walk buck naked home."

The second call was made on July 5 at 7:41 p.m. Pebbles told Edgar his girlfriend Tita (the victim's nickname) got beat up. "She came over and I beat her ass." Pebbles said she kidnapped the victim and "she's about to go work the blade for me." Pebbles said she beat up the victim because she was talking about her.

The third call was about 20 minutes later. Pebbles told Edgar that her fight with the victim the night before had been recorded. After Pebbles finished fighting the victim, M.A. and then A.C. fought her. Pebbles said it had something to do with Lillianna who

---

[5] Codefendant Juan Omar Velasquez-Mosqueda moved to sever defendants' trial from his or prohibit use of these calls. He argued admission of these calls violated his confrontation rights and was error under *People v. Aranda* (1965) 63 Cal.2d 518 and *Bruton v. United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476]. David joined that motion. The trial court admitted redacted statements (excluding references to other defendants) and instructed the jury to consider a defendant's statement only against the defendant who made it. On appeal, David contends it was error to deny severance.

owed her $250. Pebbles thought the victim knew where Lillianna was, "but she ain't sayin' nothin'."

In three other recorded calls made from the jail, David and his "homey" called David's girlfriend and told her to "get rid" of the van.

*The Defense*

Only David testified in his own defense. He admitted he asked to videotape the beating of the victim so he could post it on YouTube. He thought it was "cool"; everyone else did it, and he was "trying to be in." At some point after the beating, Pebbles announced the victim was going to tell her where Lillianna was. Pebbles said Lillianna owed her money for rent. Pebbles then asked David for a ride. David knew they were going to "see if we could find Lillianna." While they drove, the victim said she could find Lillianna, who would be with Anthony. David denied anyone said anything about walking the blade. They returned to Pebbles' residence and David went home and never saw the victim again.

David testified he accessed the redbook prostitution website because Omar had said that David's ex-girlfriend was on it.

*The People's Theory of the Case*

At the preliminary hearing, David objected to a holding order on count one, aggravated kidnapping for financial gain under section 209, subdivision (a). He argued the prosecution theory was that defendants kidnapped the victim for prostitution, and there was no evidence that he shared any intent to prostitute the victim. Further, David argued section 209 did not cover this type of scenario. Omar and Pebbles joined the objection. The prosecutor responded with evidence of the plan to prostitute the victim. The trial court (Gweon, J.) found sufficient evidence of kidnapping for purposes of extracting money from another person, "specifically [the victim]," and for extortion.

At trial, the court (Savage, J.) noted that count one was generically charged, and asked the prosecutor for the theory ("kidnapping for what?").[6] The prosecutor responded, "the evidence shows that through their actions [defendants] were attempting and had the intent to extract money from the victim in this case by virtue of that kidnapping."

After the evidence was presented, the prosecutor broadened the theory of the case to also include kidnapping to collect a debt. His theory was they "abducted [the victim] for purposes of getting some sort of financial gain from it." He argued the jury did not need to be unanimous as to the theory.

In closing argument, the prosecutor argued the reason defendants kidnapped the victim was to find Lillianna and collect a debt, and the alternate plan, if the first did not work, was to prostitute the victim. In rebuttal, the prosecutor addressed the defense argument that the threat to prostitute the victim was not real because the defendants were only kidding. "The minute they throw her in the van and they drive to Watt Avenue in Sacramento, that has to be their intent." He repeated the purpose of the kidnapping was "to make her work as a prostitute or collect money from Lillianna."

## DISCUSSION

### I

### *Sufficiency of the Evidence of Aggravated Kidnapping*

Defendants were charged with aggravated kidnapping under section 209(a). "[A]ggravated kidnapping requires the deprivation of a person's liberty for the purpose of obtaining a financial gain." (*People v. Greenberger* (1997) 58 Cal.App.4th 298, 367.) Subdivision (a) "describes four different types of aggravated kidnapping: (1) for ransom; (2) for reward; (3) to commit extortion; and (4) to exact from another person any money or valuable thing." (*People v. Ibrahim* (1993) 19 Cal.App.4th 1692, 1696.) As we have described, the People proceeded under the fourth theory of liability for aggravated

---

[6] As we discuss *post*, the statute sets forth four different theories under which aggravated kidnapping for financial gain may be prosecuted.

8

kidnapping for financial gain, labeling defendants' conduct in kidnapping the victim as the type of aggravated kidnapping aimed at exacting money or something valuable from another person.

"Exact" means "to call for forcibly or urgently and obtain." (Merriam-Webster's Collegiate Dictionary (11th ed. 2006) p. 434, col. 1.) The trial court instructed the jury only on this specific theory of aggravated kidnapping.[7] The People presented two factual theories of liability: (1) that defendants kidnapped the victim to collect the debt owed by Lillianna, or, (2) if the debt collection plan was unsuccessful, to make the victim earn money as a prostitute.

Pebbles contends there was insufficient evidence to support her conviction for aggravated kidnapping. She argues that the fourth type of kidnapping under section 209(a), which speaks of exacting money "from another person," requires not only the primary victim of the kidnapping, but also a secondary victim, the person from whom the money is exacted. Pebbles observes that there is no secondary victim under either of the prosecution's theories, arguing that Lillianna cannot be a secondary victim because there was no evidence that she had any relationship with the victim which would compel her to pay money once the victim was kidnapped, and no one who paid for the victim's services as a prostitute would be a victim because the payment would be voluntary. David joins in this argument.

---

[7] The court instructed the jury that "[t]he defendants are charged in Count 1 with kidnapping for the purpose of getting money or something valuable in violation of [section 209(a)]. [¶] To prove that a defendant is guilty of this crime, the People must prove that: [¶] One, the defendant kidnapped, or abducted, or seized, or confined, or concealed, or carried away another person; [¶] Two, the defendant held or detained that person; [¶] Three, the defendant did so to get money or something valuable; [¶] Four, the other person did not consent to being kidnapped, or abducted, or seized, or confined, or concealed, or carried away; and [¶] Five, the defendant did not actually and reasonably believe that the other person consented to being kidnapped, or abducted, or seized, or confined, or concealed, or carried away."

A. *Sufficiency of the Evidence under Debt Collection Theory*

The standard for judicial review of a criminal conviction challenged as lacking evidentiary support is well established: "the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence -- that is, evidence which is reasonable, credible, and of solid value -- such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.)

Viewed in the light most favorable to the verdict, the evidence shows the following. At the house, the victim claimed she knew where Lillianna was. Pebbles said Lillianna owed her money. David understood they were going to find Lillianna and he agreed to drive. Once defendants abducted the victim, they said they were going to the north area to find Lillianna. Pebbles wanted to prostitute Lillianna; she also wanted to beat Lillianna up. The victim understood Pebbles wanted to find Lillianna because Lillianna owed her money. The victim knew that Pebbles was mad at Lillianna. Pebbles and other girls had the victim call Anthony to find Lillianna, but the call did not lead them to Lillianna.

In her call to Edgar before the kidnapping, Pebbles said she was going to look for the girl who owed her money and beat her up. In a later call, Pebbles said the fight with the victim concerned Lillianna, who owed Pebbles money. Pebbles thought the victim knew where Lillianna was, but would not tell her ("she ain't sayin' nothin').[8]

From this evidence, a reasonable jury *could* conclude that the victim's perceived ability to lead her abductors to Lillianna, who owed Pebbles money, was a reason/motivation for her kidnapping. Defendants had reason to believe the victim knew where Lillianna was--she said she did. Since Pebbles was angry and threatening to beat up or prostitute Lillianna, the jury could infer Pebbles intended to "exact" money from Lillianna by force.

---

[8] The phone calls between Pebbles and Edgar were admitted only against Pebbles.

10

Pebbles contends, in effect, that the kidnapping is too attenuated from the plan to exact money from Lillianna because the kidnapping was not the means by which the money would be exacted from Lillianna. We agree that Lillianna would not be forced to pay simply because the victim was kidnapped. However, the kidnapping was an essential part of the plan to collect (exact) the debt from Lillianna, because Pebbles had to find Lillianna before she could get money from her. The victim knew how to find Lillianna. Forcing the victim to do so was the first step in recovering the money. Directly after the victim was abducted, the van headed to the north area to find Lillianna.

Section 209(a) is violated by one who "seizes, confines, inveigles, entices, decoys, abducts, conceals, kidnaps or carries away another person by any means whatsoever with intent to hold or detain, or who holds or detains, that person . . . to exact from another person any money or valuable thing." Defendants held and detained the victim as part of the plan to exact money from Lillianna. They held and detained the victim to find Lillianna. It is not the strongest theory of liability by any measure, but it is supported by the evidence.

David contends there is no evidence against him to support aggravated kidnapping under the debt collection theory. He contends the only evidence establishing that Pebbles wanted to find Lillianna to collect a debt came from the recorded phone calls with Edgar, and those calls were not admitted against him. David omits the fact that although the victim's testimony was not consistent, she did testify that Pebbles mentioned Lillianna's debt at the house and she knew Pebbles wanted to find Lillianna because of the debt. Moreover, David testified he learned about the debt at the house and he agreed to drive to find Lillianna.

There is sufficient evidence to support the aggravated kidnapping convictions as to both defendants under the debt collection theory.[9]

---

[9] Alternatively, defendants contend there was instructional error because section 209(a) requires a secondary victim and the instruction omitted the "from another person" element. Although defendants are correct that the pattern instruction, CALCRIM No.

11

B.  *Sufficiency of the Evidence under Prostitution Theory*

Defendants contend there was insufficient evidence to support the prostitution theory because there was no evidence that they intended to "exact from another person any money or valuable thing." (§ 209(a).)  They argue any money obtained from the victim's prostitution would be voluntarily obtained from her customer.

If defendants were correct that insufficient evidence supported the prostitution theory, we would still affirm the aggravated kidnapping convictions based on our finding that sufficient evidence supports defendants' convictions under the debt collection theory. In *People v. Green, supra,* 27 Cal.3d 1, our high court held that "when the prosecution presents its case to the jury on alternate theories, some of which are legally correct and others legally incorrect, and the reviewing court cannot determine from the record on which theory the ensuing general verdict of guilt rested, the conviction cannot stand." (*Id*. at p. 69.)  However, the rule is different where one of the alternate theories is *factually*, rather than legally, insufficient.  "If the inadequacy of proof is purely factual, of a kind the jury is fully equipped to detect, reversal is not required whenever a valid ground for the verdict remains, absent an affirmative indication in the record that the verdict actually did rest on the inadequate ground." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1128, 1129.)

If this were the end of our analysis, we would allow the aggravated kidnapping conviction to stand, because at least one of the two alternate theories (debt collection and prostitution) is factually sufficient.  However, this is not the end.  We proceed next to analyze the *legal* sufficiency of these two alternate theories, and conclude that the prostitution theory is legally invalid, thus requiring reversal under *Green.*

---

1202, omits this statutory language, we need not analyze the adequacy of the instruction here because in *this* case, any error in omitting these three words would be harmless beyond a reasonable doubt. (*Neder v. United States* (1999) 527 U.S. 1, 15 [144 L.Ed.2d 35, 51].)  It was undisputed that Pebbles sought to collect money from Lillianna, and there was no suggestion that she sought money directly from the victim.

C. *Abduction for Prostitution and the* Williamson *Rule*

Our initial review of the record revealed a potential legal problem with the aggravated kidnapping conviction for financial gain based on the theory of kidnapping for prostitution. Section 266a--abduction for prostitution--criminalizes the conduct of taking a person for purposes of prostitution. Under *In re Williamson, supra*, 43 Cal.2d 651, where conduct is proscribed by both a general and a specific statute, prosecution may proceed only by way of the specific statute. We requested supplemental briefing from the parties on the effect of the *Williamson* rule on this case.

" 'It is the general rule that where the general statute standing alone would include the same matter as the special act, and thus conflict with it, the special act will be considered as an exception to the general statute whether it was passed before or after such general enactment.' " (*In re Williamson, supra,* 43 Cal.2d at p. 654.) "Under the *Williamson* rule, if a general statute includes the same conduct as a special statute, the court infers that the Legislature intended that conduct to be prosecuted exclusively under the special statute. In effect, the special statute is interpreted as creating an exception to the general statute for conduct that otherwise could be prosecuted under either statute. [Citation.]" (*People v. Murphy* (2011) 52 Cal.4th 81, 86.)

"[T]he *Williamson* preemption rule is applicable (1) when each element of the general statute corresponds to an element on the face of the special statute or (2) when it appears from the statutory context that a violation of the special statute will necessarily or commonly result in a violation of the general statute." (*People v. Watson* (1981) 30 Cal.3d 290, 295-296 (*Watson*).) "[W]hen the Legislature has enacted a specific statute addressing a specific matter, and has prescribed a sanction therefor, the People may not prosecute under a general statute that covers the same conduct*, but which prescribes a more severe penalty*, unless a legislative intent to permit such alternative prosecution clearly appears." (*Mitchell v. Superior Court* (1989) 49 Cal.3d 1230, 1250 (*Mitchell*).)

Section 209(a) provides in part: "Any person who seizes, confines, inveigles, entices, decoys, abducts, conceals, kidnaps or carries away another person by any means whatsoever with intent to hold or detain, or who holds or detains, that person for ransom,

reward or to commit extortion or to exact from another person any money or valuable thing, or any person who aids or abets any such act, is guilty of a felony . . . ." The sentence for this crime is life without the possibility of parole where the victim suffers death or bodily harm or life imprisonment with the possibility of parole where the victim does not suffer death or bodily harm. (§ 209(a).)

Section 266a provides: "Every person who, within this state, takes any person against his or her will and without his or her consent, or with his or her consent procured by fraudulent inducement or misrepresentation, for the purpose of prostitution, as defined in subdivision (b) of Section 647, is punishable by imprisonment in the state prison, and a fine not exceeding two thousand dollars ($2,000)." "The offense may be committed in two ways, first, by taking a female person for prostitution purpose, *against her will*; secondly, by obtaining her consent by means of fraudulent inducement." (*People v. Mandell* (1939) 35 Cal.App.2d 368, 372.)

The evidence supporting the People's theory at trial that the defendants kidnapped the victim for purposes of prostitution would support a conviction under section 266a. If the *Williamson* rule applies to this case, it precludes a conviction for aggravated kidnapping under that theory.

In their supplemental brief, the People argue that "it is clear from the evidence that the prosecution's theory of the case was that the victim was kidnapped so she could make contact with Lillianna, a person Pebbles was looking for because Lillianna owed her money." The People contend the threats to make the victim "walk the blade" were simply intended to intimidate the victim and force her cooperation. The People conclude "there was no alternate prosecution theory which would have supported a Section 266a charge."

This position is not only inconsistent with the record, where, as detailed *ante*, the People repeatedly offered kidnapping for prostitution as an alternate theory, but also inconsistent with the People's original brief. In their respondent's brief, arguing there was sufficient evidence of aggravated kidnapping, the People asserted: "Appellants kidnapped [the victim] and made her pay her own ransom by attempting to sell her as a

14

prostitute.  I[n] effect, appellants kidnapped [the victim] to extort something of value, her body, in exchange for money."  "Further, as stated above, appellants kidnapped [the victim] for the purposes of using her as a prostitute to gain money."  Indeed, the People did not even address the sufficiency of the evidence of the debt collection theory in their briefing, but instead relied on the evidence supporting the prostitution theory and cited to *People v. Guiton, supra*, 4 Cal.4th 1116, for the proposition that where only one factual theory of the case is supported, the conviction stands.  We reject the People's newly taken position that this case was not tried on a theory of kidnapping for prostitution.  The record is to the contrary.

The People next contend the *Williamson* rule does not apply.  First, they note that section 209(a) has different elements than section 266a.  But the *Williamson* test does not require that the special statute (here abduction for prostitution) include every element of the general statute (here aggravated kidnapping).  It is sufficient if "a violation of the special statute will necessarily or commonly result in a violation of the general statute." (*People v. Watson, supra,* 30 Cal.3d at p. 296.)

The People contend a violation of section 266a will not "necessarily or commonly" result in a violation of section 209(a).  Section 209(a) requires that the victim not consent to the kidnapping.   (*People v. Eid* (2010) 187 Cal.App.4th 859, 878).)  The People argue section 266a "can be satisfied by procuring the victim's consent by fraudulent inducement or misrepresentation."

Section 209(a) can be violated if the defendant "inveigles, entices, decoys."  "The predicate acts 'inveigle' and 'decoy' connote deception, but not force or fear; they are, however, inconsistent with a victim's *knowing* consent." (*People v. Eid, supra,* 187 Cal.App.4th at p. 875.)  Thus, the statutory language indicates the lack of consent necessary for violating section 209(a) is satisfied by deception.  Taking a person by fraudulent inducement or misrepresentation will "necessarily or commonly" result in a violation of section 209(a).

Section 209(a) conflicts with section 266a because it prescribes a more severe penalty than section 266a. (*Mitchell, supra,* 49 Cal.3d at p. 1250.) The penalty for violating section 209(a) is life in prison, with or without the possibility of parole. (§ 209(a).) Section 266a is a felony, punishable by 16 months, or two or three years in prison. (§§ 266a, 18.)

Nothing in either section 266a or section 209(a) shows a legislative intent to permit alternative prosecution under the more general statute. Accordingly, the People could not prosecute defendants under section 209(a) for the same conduct proscribed by section 266a. (*Mitchell, supra,* 49 Cal.3d at p. 1250.) The *Williamson* rule precluded prosecution for aggravated kidnapping on the theory that defendants took the victim for purposes of prostitution.

There is no basis in the record to conclude that all the jurors based their verdict on the debt collection theory. The jury returned general verdicts which did not identify the theory on which the verdict was based. (§ 1150; see *People v. Gurule* (2002) 28 Cal.4th 557, 631.) Further, the prosecutor told the jurors that they need not be unanimous as to the theory of aggravated kidnapping. "And you don't all have to agree on whether or not they are trying to use [the victim] to collect money or they are trying to prostitute her out, as long as you believe one of those two are supported by the evidence, he's guilty. Six of you can believe one theory, six of you can do another." As discussed, the prosecution presented some evidence as to each theory. In their original brief, the People suggested the prostitution theory, the legally invalid theory for aggravated kidnapping, was stronger, arguing that: "[T]he bulk of the evidence presented detailed appellants' plans to prostitute [the victim] for money."

Because the record does not show the aggravated kidnapping verdict was based on a legally valid theory, it must be reversed.

## II

### *Reduction to Simple Kidnapping*

While maintaining that the convictions for aggravated kidnapping should stand, the People contend that if the convictions cannot stand, they can be reduced to simple kidnapping (§ 207) because there is substantial evidence to support such convictions. We disagree.

"When the verdict or finding is contrary to law or evidence, but if the evidence shows the defendant to be not guilty of the degree of the crime of which he was convicted, but guilty of a lesser degree thereof, or of a lesser crime included therein, the court may modify the verdict, finding or judgment accordingly without granting or ordering a new trial, and this power shall extend to any court to which the cause may be appealed." (§ 1181, subd. 6; see also § 1260.) The authority to modify a verdict granted by section 1118 does not extend to modification to a lesser related offense. (*People v. Lagunas* (1994) 8 Cal.4th 1030, 1034.)

"Simple kidnapping is not a lesser and necessarily included offense to a violation of section 209, subdivision (a) since the latter can be accomplished without asportation and the former cannot." (*People v. Greenberger, supra*, 58 Cal.App.4th at p. 368, fn. 56.) Accordingly, there is no authority for reducing the aggravated kidnapping conviction to the lesser related crime of simple kidnapping.

The information charged David and Pebbles with simple as well as aggravated kidnapping. Had the jury returned guilty verdicts on this charge and the trial court imposed sentence, staying its execution pursuant to section 654, these convictions could now replace the aggravated kidnapping convictions. However, that is not what happened. The court erroneously instructed the jury that if it found any defendant guilty of count one, aggravated kidnapping, to return the verdict form for count two (simple kidnapping) unsigned. (See CALCRIM No. 3516) The jury complied, and although defendant was tried on simple kidnapping, the jury did not return a verdict on that charge. "Once jeopardy has attached, discharge of the jury without a verdict is tantamount to an

17

acquittal and prevents a retrial, unless the defendant consented to the discharge or legal necessity required it." (*Stone v. Superior Court* (1982) 31 Cal.3d 503, 516.) Here, no legal necessity, such as a hung jury, required dismissal of the jury without a verdict. The kidnapping convictions cannot be reduced to simple kidnapping, nor can the simple kidnapping charge be tried again.

III

*Remaining Contentions*

Defendants also contend there was instructional error because the court's instruction on aggravated kidnapping omitted the element "to exact from another person." Alternatively, they contend it was ineffective assistance of counsel to fail to request a proper instruction. Pebbles requests a correction to the abstract of judgment to show her sentence as life with a seven-year minimum rather than seven years to life. David contends it was error to deny his motion for severance because in the recorded calls to Edgar, Pebbles admits the kidnapping for financial gain. He contends the failure to sever violated *Aranda/Bruton* and requires reversal of count one. Because these contentions all relate to the convictions for aggravated kidnapping, which we reverse, we need not address them.

We do observe that the abstracts of judgment for both Pebbles and David do not reflect the restitution order and other mandatory fines imposed by the trial court. The omitted information should be added.

18

## DISPOSITION

The judgment regarding defendants' convictions for aggravated kidnapping are reversed and remanded for possible retrial on the debt collection theory alone, in accordance with this opinion.  The People shall have 60 days following remittitur from this court to reinstate the charge for aggravated kidnapping and retry that charge.  If the People fail to give such notice, the trial court is directed to prepare amended and corrected abstracts of judgment adding the omitted information about restitution and fines, and to forward certified copies to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.


                                                /s/
                                        Duarte, J.


We concur:


   /s/
Nicholson, Acting P. J.


   /s/
Mauro, J.